INDUSTRIAL EQUIPMENT COMPANY, Plaintiff-Appellee-Cross-Appellant,

v.

EMERSON ELECTRIC COMPANY, Defendant-Appellant-Cross-Appellee.

Nos. 76–1049 and 76–1050.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1977.

Decided May 3, 1977.

Donald L. Cox, Lynch, Sherman, Cox & Fowler, Louisville, Ky., for plaintiff-appellee-cross-appellant.

Daniel R. O'Neill, Edwin S. Taylor, Veryl L. Riddle, Michael B. McKinnis, St. Louis, Mo., Robert I. Cusick, Bert T. Combs, Tarrant, Combs & Bullitt, Louisville, Ky., for defendant-appellant-cross-appellee.

Before WEICK, CELEBREZZE and PECK, Circuit Judges.

WEICK, Circuit Judge.

Emerson Electric Company (Emerson) has appealed from a judgment of $50,000, entered upon a jury verdict against it in favor of Industrial Equipment Company, Inc. (Industrial), for breach of an alleged contract for an exclusive distributorship for Emerson's Browning Division products in the Louisville, Kentucky area. Industrial has cross-appealed from the District Court's directed verdict in favor of Emerson on Industrial's action for damages on certain tort claims for libel and interference with contractual relationships with its customers, and from the Court's denial of certain discovery in connection therewith.

The controversy in these appeals arose essentially from Emerson's decision in 1972 to sell Browning equipment to a distributor in Louisville, which carried Browning equipment in stock, named Machine Drives & Hydraulic Supply Corporation (Machine Drives). Industrial contended that these sales violated its alleged "exclusive" distrib-utorship agreement with Emerson. Actually there was no written contract for an exclusive distributorship between Industrial and Emerson, or between the parties' predecessors. There was, however, a course of conduct between the parties for a number of years, and trial testimony from which the District Court, in its instructions to the jury, permitted the jury to infer that there was an exclusive distributorship contract. The Court also determined that Industrial was entitled to commissions on all shipments by Emerson to "unapproved distributors within 50 to 100 miles of Louisville, regardless where resold," these shipments covering a period from 1960 to a date to be determined by the jury.

We reverse as to the Court's holding that as a matter of law there existed an exclusive distributorship contract between the parties, and we affirm as to the Court's directed verdict in favor of Emerson on Industrial's tort claims and as to the Court's denial of certain discovery in connection therewith.

Industrial is a Kentucky corporation organized in 1956, having its principal place of business in Louisville, Kentucky, and is the successor to a proprietorship owned by Mr. and Mrs. William A. Mivelaz, founded by them in the 1930's. In 1956 the business was divided into three corporations: Industrial Equipment Company, plaintiff-appellee (cross-appellant), Industrial Oxygen Company, and Industrial Realty. Industrial Equipment Company succeeded to the power transmission business and sold various lines of power transmission equipment to original equipment manufacturers (OEM's) dealers, and users located in the area of Louisville, Kentucky.

Emerson is a Delaware corporation with its principal place of business outside the Commonwealth of Kentucky. Emerson acquired substantially all of the assets and liabilities of the Browning Manufacturing Company (Browning Mfg.), a Kentucky corporation, in 1969. After the merger Browning operated as the Browning Manufacturing Division of Emerson Electric

Company (Browning Division). The original Browning Manufacturing Company sold power transmission equipment to the Mivelaz proprietorship and later to Industrial Equipment Company, both of which acted as a distributor for Browning Mfg. After the 1969 merger Emerson's Browning Division continued to sell power transmission equipment to Industrial.

In 1938 the Mivelaz proprietorship began purchasing and distributing Browning Mfg. products, and the evidence indicates that at the same time the Mivelaz proprietorship began receiving commissions in the form of credits on sales by Browning Mfg. of its products to two other Louisville, Kentucky distributors, Neill-LaVielle Supply Company and Graft-Pelle Company. The testimony of Mr. and Mrs. Mivelaz and of Fred Metzmeier, Vice-President of Industrial, indicated that these commissions amounted to somewhere between one-half of one percent and ten percent of the purchase price, and were reflected in written monthly statements. The statements were pink in color and stated that the credit was for commissions on sales made to dealers in Industrial's "territory". The monthly statements, however, were never produced at trial.

The evidence further indicated that the commission payments stopped without explanation in 1960 or 1961, some eight or nine years before Emerson acquired Browning Mfg. After 1960 or 1961 no commissions were ever again paid to Industrial by Browning Mfg. or by its successor, Emerson, and it was not until September, 1974, the date of the filing of Industrial's amended and supplemental complaint, that Industrial made any claim that any commissions were due to it from Emerson.

In addition to the commission payment forms, other written documents and correspondence evidenced the nature of the business relationship between Industrial and Emerson over the years. In 1947 Browning Mfg. and Industrial entered into a consignment agreement whereby Browning appointed Industrial as its agent in Louisville to sell Browning "V" Drives. The agreement stated:

The agent agrees to sell the owner's Sheaves and Belts exclusively.

This consignment contract was "closed out" approximately one year later.

In 1955 the parties entered into a beltmeter contract "in view of the agent's exclusive sale of Browning Sheaves and V-Belts." This beltmeter contract was terminated seven or eight years later.

The evidence further reveals a series of letters between Industrial and Emerson beginning in 1967, in which Industrial asked Emerson for a commitment that Industrial was, and/or would be, the exclusive Browning distributor in Louisville.

On August 17, 1967 T. Frank Jones, Vice-President of Sales at Browning Mfg., wrote to Mivelaz indicating that it might benefit both Browning and Industrial if Browning sold to "an additional distributor in the Louisville market." Jones indicated that an additional distributor might generate more business for the "original distributor," presumably Industrial.

On August 23, 1967 Industrial responded, in pertinent part:

As long as we maintain this inventory, we expect to be the exclusive stocking distributor in Louisville.

In replying, Jones did not directly respond to Industrial's stated expectation that it be the exclusive Louisville distributor; rather, Jones indicated that he would "drop" the matter of an additional distributor.

About six months later, when Browning Mfg. requested Industrial to take on a new line of gear reducers, Industrial wrote to Browning on March 22, 1968, stating:

The stocking of the Brownng Reducer line would necessitate giving up our present line. In turn we would expect exclusive rights to sell your reducers in the Greater Louisville Area . . . .

Six days later, on March 28th, a second letter was written by Industrial, stating:

We are very agreeable to go along with you and put in the suggested stock but first must have a commitment from Browning as to their distribution policy.

On March 29, 1968 Jones responded to Industrial's two letters as follows:

I really don't understand your letter of March 28. You ask about policy. Our policy hasn't changed in the years that you have been our Distributor, and we don't anticipate any change.

. . . . .

Since you are the BROWNING Distributor in Louisville, it would appear to us that we should make our offer to you in the sale of our fine new product.

The evidence in the present case also showed that there were approximately twenty-five other smaller distributors of Browning products who had sales offices and/or representatives within a 100-mile radius of Louisville, during the period between 1960 and May, 1975. (Defendant's Ex. 31). Eleven of these distributors were located within a 75-mile radius of Louisville. Mivelaz, on cross-examination, testified that for a number of years he had been aware of various distributors in the Louisville area, such as Kentucky Bearings, Wilson Machinery, and W. W. Grainger.

With respect to Kentucky Bearings, in 1963 Industrial complained to Browning Mfg. that Kentucky Bearings was selling in Industrial's sales territory. Frank Jones of Browning told Kentucky Bearings to cease stocking and selling products in the Louisville area. The testimony indicated that Kentucky Bearings nevertheless continued to sell in Louisville until the date of trial. The following exchange took place on the cross-examination of Mivelaz:

Q Sir, is it not a fact that Kentucky Bearings has been selling in Louisville since at least 1965 and selling Browning products?

A In violation, yes, and we complained from the very first day we knew it up until—up until even right now. Those are the people I wanted removed in that letter, not these little mediocre hardware stores.

Mivelaz also testified that he had been aware for several years of a Browning distributor in Danville, Kentucky, located about fifty miles from Louisville, and a Browning distributor in Corydon, Indiana, Kenneth H. Brown & Son. Mivelaz further testified that he had been aware that another company, Neill-LaVielle, sold and stocked Browning products in Louisville from 1938 until 1960 or 1961, but that when Emerson stopped the payment of commissions to Industrial in 1960 or 1961 Mivelaz "assumed" that Neill-LaVielle had ceased distributing Browning products. The evidence reveals that the Chairman of the Board of Neill-LaVielle was Mivelaz's brother-in-law, but Mivelaz testified that he never asked his brother-in-law what products Neill-LaVielle was carrying. Mivelaz stated, "For 20 years we didn't speak business."

In 1971 Emerson began negotiating with Machine Drives & Hydraulic Supply Co., Inc. to establish a distributorship in Louisville. In late 1972 Emerson's salesman for the Louisville area, Eugene Dorval, notified Industrial's Vice-President, Fred Metzmeier, that Machine Drives would soon become an additional Browning distributor in the Louisville area. At that time Mivelaz was hospitalized, and Dorval and Metzmeier agreed not to tell Mivelaz about Machine Drives until Mivelaz returned to work. In February, 1973 when Mivelaz returned to work he was informed by Dorval of Machine Drives' scheduled opening. Dorval told Mivelaz, as he had previously told Metzmeier, that certain customers in the Louisville area would remain Industrial's accounts, and that Browning would not "solicit at these accounts with Machine Drives." Mivelaz strenuously objected to the addition of Machine Drives as a Browning distributor in the Louisville area.

On April 17, 1973 Industrial's attorney wrote Browning stating in pertinent part:

A review of correspondence between Browning and Industrial indicates that Industrial was initially and probably up until a short time ago the exclusive distributor of Browning products in the Louisville area . . . . .

In view of the foregoing this letter constitutes written demand:

(1) That Browning eliminate all distributors of its products in the Louisville, Kentucky Area (radius of 50 miles of Louisville) except Industrial Equipment Company,

(2) or failing in number 1 that Browning accept return of the inventory that Industrial now has on hand at its current value.

By letter of June 11, 1973, Emerson's attorney responded, in pertinent part:

Exclusive distributorship agreements are contrary to Browning's policy, and there is no record of any such agreement with Industrial Equipment. So that there will be no future misunderstanding on Industrial Equipment's part, Browning hereby notifies it that it did not, does not now, and will not in the future have any exclusive rights to Browning products. Browning will not terminate its other customers or attempt to restrict them in order to protect Industrial Equipment from competition.

The letter went on to inform Industrial that it could continue as a non-exclusive Browning distributor but that if Industrial was unwilling to do so Emerson would repurchase Industrial's inventory of Browning equipment with certain adjustments for reconditioning, repacking and shipping.[1]

Also on June 11, 1973 Mr. Robert E. Browning, President of the Browning Division, wrote a memorandum to Dorval, stating in part:

In the meantime, you can start your program of working with Machine Drives to try to capture more business for Browning. As you are making calls with them on customers, I would suggest that you take the approach that you are introducing Machine Drives to the customer, as a distributor of Browning. You can give your opinion to the customer of Machine Drives as a Browning distributor, but you should make sure that their strategy is such that Machine Drives does the actual selling job on the customer to convince the customer that for whatever reason they should get the business, instead of Industrial Equipment. In other words, I do not think that you should do Machine Drives' selling job, but rather they should. Your function is one of introduction and company sponsored assistance as required, and this company sponsored assistance can come either through you or Industrial Equipment.

Thereafter Industrial conducted a "sales blitz" in conjunction with Machine Drives by making sales calls on potential and existing customers of Browning products in the Louisville area. Robert Browning testified that the purpose of the "blitz" was to protect Browning's market and "to have someone who could pick up the coverage of the various accounts, were we to be canceled out by Industrial."

About three months after the sales blitz, in October, 1973, Industrial filed its initial complaint against Emerson in the federal court alleging in Count I a breach of its alleged exclusive distributorship agreement with Emerson, by Emerson's establishment in late 1972, of a competing distributor, Machine Drives, within Industrial's alleged exclusive territory. Count II alleged that Emerson had tortiously interfered with Industrial's contractual relations with its (Industrial's) customers by providing Machine Drives with lists of Industrial's customers and orders and other confidential information during the course of the sales blitz.

Following publication of an article in a Louisville newspaper about Industrial's suit, Machine Drives mailed a letter to its customers, stating:

Gentlemen:

During and after this period of litigation referred to in the enclosed article from the October 10, 1973 edition of the Louisville Times, there may be some question in your mind about the availability of Browning Products and who repre-

1. It is important to note that both parties recognize that Emerson did not *terminate* its relationship with Industrial; rather, what Industrial contends on appeal is that Emerson breached the exclusivity feature of its alleged exclusive distributorship agreement with Emerson.

sents the Browning Manufacturing Division as a Distributor.[2]

Our contention has always been that exclusive contracts of the type Industrial Equipment Co. claims to have are illegal due to the Anti-Trust Laws.

Machine Drives and Hydraulic Supply Corp. is now and will continue to be in a position to supply Browning merchandise from our large local stock.

We would appreciate the opportunity to serve you.

Sincerely yours,

/s/ Thomas R. Whitton
 President.

Enclosures: Newspaper clipping
 List of lines [Footnote added]

Machine Drives' letter prompted the filing of an amended complaint by Industrial in November, 1973 in which Industrial brought certain claims against Machine Drives alleging, *inter alia,* libel and tortious interference with Industrial's relationships with its customers. Industrial later dismissed its claims against Machine Drives in March, 1974. The order of the Court stated:

ORDERED That Plaintiff's complaint and amended complaint be and they are hereby dismissed settled, with prejudice, as to the Defendant Machine Drives & Hydraulic Supply Corp.

In September, 1974 Industrial filed an amended and supplemental complaint charging, *inter alia,* that Emerson caused Machine Drives' allegedly libelous letter to be mailed and/or ratified such letter, and that such action damaged Industrial's business reputation and constituted tortious interference with Industrial's economic relations with its customers.

Industrial also claimed (for the first time since 1960 or 1961) that Industrial's "agree-

ments with Emerson (Browning) provide in part that Emerson will pay Industrial a sum equal to ten percent (10%) of the sales price of all Browning or Emerson products sold in the Louisville area to persons other than Industrial," and that Emerson should be required to pay to Industrial commissions on all sales made in violation of these agreements.

Trial commenced in July, 1975. At the conclusion of all of the evidence the District Court sustained Emerson's motion for a directed verdict with regard to all of Industrial's tort claims, and overruled Emerson's motion for a directed verdict on the contract claims.

Thereafter the Court instructed the jury that there was an exclusive distributorship agreement between the parties and that Emerson agreed to pay Industrial an indeterminate commission on all shipments to unapproved distributors within a 100-mile radius of Louisville. In so doing the Court instructed the jury as follows:

Now, addressing ourselves more specifically to the issues of this case, the plaintiff in this case contends that there was an agreement between it and Browning whereby Browning agreed that it would not ship directly to a distributorship—to a distributor within 50 to 100 miles of the City of Louisville except as agreed to by the plaintiff. Defendant further agreed that if distributors, of which plaintiff did not approve, opened sales offices within 50 to 100 miles of Louisville, defendant would not drop-ship to parties within 50 to 100 miles of Louisville who purchased from the unapproved offices. As part of this agreement, defendant agreed to pay a commission somewhere between one-half of one and ten percent to plaintiff on all shipments to unapproved distributors

2. It should be noted that before this letter was mailed to Machine Drives' customers a draft was sent to Robert Browning at Emerson; he suggested that the following phrase be deleted from the first paragraph thereof:
 it is possible that Browning products may not be available through Industrial Equipment Company.

Robert Browning testified that the above phrase implied that the Browning Division might terminate Industrial, whereas, in fact, the Browning Division had no such intention. Thereafter Machine Drives changed the first paragraph to read as set forth in the text above.

within 50 to 100 miles of Louisville, regardless where resold.

It is my duty to instruct you on whether or not such an agreement in fact existed, and after reviewing this matter it is my conclusion that insofar as this case is concerned and for our purposes here in this lawsuit that there was an exclusive distributorship between the plaintiff and the defendant and the defendant was obligated as heretofore stated. You are further instructed that the Court has concluded that as a matter of law the contract referred to herein was not illegal and was not in violation of the federal antitrust laws.

Now, the defendant contends that the plaintiff breached this agreement itself after 1967 when it refused or failed to hire outside salesmen and by halting advertising and reducing inventory and that because of this breach the defendant was excused from the obligation previously described. I instruct you that it was plaintiff's obligation under the exclusive dealership, distributorship agreement, to stock the defendant's products and to use its best efforts to sell and promote those products, and failure to do so was a breach of the agreement.

Plaintiff has presented evidence as to its position and its attitude in regard to increasing its outside sales forces, as to halting its advertising and as to reducing inventory. And defendant has in like manner presented its position and presented its attitude. From this evidence you must determine whether this failure or refusal was a breach of defendant's (sic) obligations to use its best efforts to sell and promote Browning products. If you find that plaintiff did in fact breach its agreement in this regard, it may not sue on the agreement and your verdict must be for the defendant on plaintiff's exclusive distributorship claim for any damages after plaintiff's breach, if any.

The Court then submitted to the jury the issue of the commission rate and the damage period, as follows:

The period for which damages may be awarded begins no earlier than October 9, 1960, and runs to a date determined by you. That's your prerogative, your discretion, and left to your determination.

The agreement between plaintiff and defendant was terminable after a reasonable time by plaintiff or by Browning, subject to reasonable notice. Defendant's breach of the agreement terminated the exclusivity aspect of the agreement and the reasonable period of notice begins to run from the time Machine Drives began business in approximately December, 1972 and for a reasonable period thereafter.

In determining what period would be reasonable, you should consider all the circumstances surrounding the contract, such as how long plaintiff has had the line already, the availability of other lines similar to Browning and the time and effort required by plaintiff to secure another line, how long it would take plaintiff to dispose of its Browning inventory, how many times plaintiff turned the Browning inventory in a year, the effect terminating the exclusive aspects of the agreement has had on plaintiff's sales, what the practice has been in the industry, including how much notice plaintiff has given suppliers it has discontinued and how much notice suppliers have given plaintiff in the past and how much notice defendant has given distributors and has in turn been given by distributors who stopped buying the Browning line.

The measure of damages on plaintiff's exclusive distributorship agreement claim is an amount not to exceed ten percent of the defendant Emerson Electric Company's total dollar sales and shipments into the Louisville area to these companies, Kenneth Brown Company, Neil-LaVielle, Graft-Pelle Company, Machine Drives Company from 1960 to such time as I have—I can't make this out—to such time as I have instructed you covering the period of—I can't make this out; I'm sorry. Will you gentlemen approach the bench, please?

(Whereupon, at this point there were comments off the record between the court and counsel at the bench out of the hearing of the jury, after which the following proceedings occurred in open court)

By the Court: (Continuing)—from 1960 to such time as I have instructed you covering the period of damages. Now, your total award may not exceed the sum of $160,165.65.

The jury returned a verdict in favor of Industrial for $50,000, covering the time period from 1960 through February, 1976.

I

■ We are of the opinion that the question as to whether or not there was an exclusive distributorship between Emerson and Industrial involved "either a mixed finding of fact and conclusion of law, or . . . a finding of the ultimate fact in the making of which is involved legal principles." *United States v. Weingarden,* 473 F.2d 454, 460 (6th Cir. 1973).

The decision on the existence of a contract and the decision on the construction of a contract are both ultimate questions of law. As this Court stated in *Bach v. Friden Calculating Mach. Co.,* 155 F.2d 361, 364 (6th Cir. 1946):

Insofar as the court undertook to determine the existence or validity of the alleged contract, whether in findings of fact or conclusions of law, it involves legal determinations which we ourselves are competent to make and may do so not withstanding Federal Rules of Civil Procedure, rule 52(a) . . . .

Also, as this Court noted in *Cordovan Assoc., Inc. v. Dayton Rubber Co.,* 290 F.2d 858, 860 (6th Cir. 1961):

The interpretation and construction of a written contract are matters of law within the competence of the Court of Appeals to review and do not come under the clearly erroneous rule.

Moreover, as this Court stated in *Thomas v. Union Ry.,* 216 F.2d 18, 20 (6th Cir. 1954):

In jury trials, erroneous rulings embodied in instructions are presumptively injurious and furnish grounds for reversal unless it affirmatively appears they were harmless.

We recognize that a legal conclusion may rest upon subordinate factual determinations, but where, as here, the record contains certain undisputed facts and circumstances which are dispositive of the issue presented, we must view the question of contract interpretation as one of law which we may review on appeal. Thus, we are "free to draw our own legal conclusions and inferences" from the record in the present case in determining whether there was an exclusive distributorship between Emerson and Industrial. *Taft Broadcasting Co. v. Columbus-Dayton Local,* 297 F.2d 149, 152 (6th Cir. 1961). *See also Bogardus v. Commissioner,* 302 U.S. 34, 39, 58 S.Ct. 61, 82 L.Ed. 32 (1937); and *Glasson v. City of Louisville,* 518 F.2d 899, 903 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975), and cases cited therein.

■ We are of the opinion that while there may have been sufficient evidence from which to infer that an exclusive distributorship agreement might have existed between the parties before 1960 or 1961, the record consists of undisputed facts and circumstances which clearly establish that Industrial did not receive any commission payments after 1960 or 1961, and that Industrial knew for a number of years that it was not the exclusive Browning distributor in the Louisville, Kentucky area. Thus, a review of the record establishes that there was no exclusive distributorship between the parties after 1960 or 1961.

First, with respect to the 1947 consignment agreement and the 1955 beltmeter contract between Browning Mfg. and the Mivelaz proprietorship, to both of which contracts Industrial points as indicia of an exclusive distributorship continuing to the time of the alleged breach in 1972, it is sufficient to note that the 1947 contract was terminated one year later, and that the 1955 contract was terminated seven or eight years later. Moreover, the language

in these two contracts did not indicate that Industrial was the exclusive distributor in Louisville; rather, the contracts indicated that Industrial would carry a certain Browning line of equipment to the exclusion of similar items manufactured by other companies.

Next, it is undisputed that until 1960 or 1961 Browning Mfg. paid commissions to the Mivelaz proprietorship and to its successor, Industrial Equipment, on sales made by Browning to two Louisville distributors, Neill-LaVielle and Graft-Pelle. There is no evidence, however, that these commission payments continued after 1960 or 1961, and at no time between 1960 or 1961 and September, 1974, the date of Industrial's amended and supplemental complaint, did Industrial ever make any claim against Browning Mfg. or Emerson for any commissions. While the evidence is unclear as to whether the commission payments prior to 1960 or 1961 were made *because* Industrial had an exclusive distributorship with Emerson, we are of the opinion that such is a logical inference. Indeed, Industrial does not contend that there is now due to it commissions on sales to other area Browning distributors *irrespective* of whether there was an exclusive distributorship[3]; rather, Industrial in its arguments to this Court, and the District Court in its instructions to the jury, premised any award of percentage commissions on the existence of an exclusive distributorship. Once the commission payments stopped in 1960 or 1961, Industrial should have been on notice that the exclusivity feature of its distributorship agreement with Browning Mfg. (if, in fact, it ever had such a feature at all) had been terminated, and that its arrangement with Browning Mfg. and later with Emerson was thereafter a non-exclusive arrangement.

We add that even if the commission payments were somehow separate from the purported exclusive distributorship, there was other ample evidence which further establishes that Industrial did not have an exclusive distributorship agreement with Emerson.

There were approximately twenty-five other smaller Browning distributors within a 100-mile radius of Louisville during the period from 1960 to May, 1975. Mivelaz's testimony indicated that although he had been aware of many of these distributors for many years he considered some to be "outside jobbers" who were not in violation of the purported exclusive distributorship. Mivelaz testified:

A . . . [A]ny outside jobber could ship into Louisville providing he was not a stocking distributor.

 . . . . .

Q And what do you mean provided he wasn't a stocking distributor?

A Providing he did not carry a local stock and solicit business as a Browning distributor in Louisville.

The evidence is unclear as to the number of identified area distributors who could have been properly classified either as "stocking distributors" or as "outside jobbers." Mivelaz's testimony concerning W. W. Grainger is a case in point. Mivelaz testified that he had been aware for some twenty years that W. W. Grainger had been selling in Louisville, but that he had not objected because W. W. Grainger was a "Chicago-based company." Later, however, Mivelaz was asked again about W. W. Grainger and he indicated that W. W. Grainger was a stocking distributor in Louisville. Also, Mivelaz expressed a different reason for not having objected to the activities of W. W. Grainger in Louisville. The following brief exchange took place:

Q You don't object to them [W. W. Grainger] stocking and selling in Louisville because they don't sell much?

A Basically, yes.

---

3. Even if Industrial did contend that the commission payments were separate or divisible from the alleged exclusive distributorship agreement, we do not see how commission payments *until* 1960 or 1961 on sales to *only two* area distributors form any basis for Industrial's claim for commission payments *after* 1960 or 1961 on sales to *all* area distributors.

Mivelaz was also asked about his company's relationship with Neill-LaVielle. The following exchange took place:

Q Sir, is it your testimony here today that you were not aware that Neill-LaVielle was selling—well, first of all, are you aware, as you sit there today, that Neill-LaVielle is selling and stocking Browning products in Louisville?

A We are not aware; we know it.

Q All right. You know it as you sit there?

A Yes.

Q All right. When did you first learn this?

A We didn't first learn it. It's back in 1938 or '9, our company and Neill-LaVielle Supply Company had differences of opinion and they overcharged us on items and they told us if we didn't want to pay their price to say away, which we did for 20 years.

Q Sir, when—you know now that Neill-LaVielle is selling Browning in Louisville and stocking it, right?

A Now; items. -

Q All right. Items made by Browning?

A Yes.

Q All right. When did you first learn that?

A 1938.

Mivelaz then testified that when the commission payments from Browning stopped in 1960 or 1961 Mivelaz "assumed" that Neill-LaVielle had ceased being a Browning distributor. We find it incredible, however, that Mivelaz never learned that Neill-La-Vielle had, in fact, continued after 1960 or 1961 to be a Browning stocking distributor, particularly in light of the fact that the Chairman of the Board of Neill-LaVielle, M. H. Young, was Mivelaz's brother-in-law.

⸰ Dorval, Browning's Louisville salesman, also testified that Neill-LaVielle stocked and distributed Browning goods in the

Louisville area. Furthermore, Defendant's Exhibit 31 indicates that Graft-Pelle Company was a Browning distributor in Louisville from 1960 to 1965.

The evidence thus indicates that there was at least one other stocking distributor in the Louisville area from 1960 to May, 1975, namely Neill-LaVielle, and that there may have been others among the twenty-plus other area distributors of Browning products, of many of whom Industrial was or should have been aware.

We recognize that, as stated in *Sandura Co. v. F.T.C.*, 339 F.2d 847, 856 (6th Cir. 1964):

The word "exclusive" is sometimes employed to describe a situation where there is only one appointed distributor in a defined geographical area, but without prohibition against an outside distributor selling in the same area.

However, in the present case those distributors who were not necessarily "stocking" distributors in Louisville, were nevertheless distributors within a 100-mile radius of Louisville and thus could not fairly be characterized as being "outside" distributors, because in fact they were distributors within Industrial's alleged exclusive territory of one hundred miles around Louisville.

In Black's Law Dictionary 673 (Rev. 4th ed. 1968) the word "exclusive" is defined as follows:

Appertaining to the subject alone, not including, admitting, or pertaining to any others . . . Sole . . . Shutting out; debarring from interference or participation; vested in one person alone.

The Third Circuit, in *Williams v. Independent News Co.*, 485 F.2d 1099, 1104 (3d Cir. 1973), stated:

By definition an exclusive dealing contract excludes potential competitors from competition with the exclusive dealer.

Industrial was, indeed, the *main* Browning distributor [4] within its alleged exclusive

---

4. It should be noted that with respect to the statement in the March 29, 1968 letter from Frank Jones of Browning Mfg. to Industrial, which statement read, "[S]ince you are the BROWNING distributor in Louisville . . . ." the evidence in the present case indicates that Jones probably meant that Industrial was Browning's main

territory, but it simply was not knowingly the *sole* Browning distributor in Louisville and/or within a 50–100 mile radius thereof, and therefore was not the exclusive Browning distributor.

■ Industrial also relies on the above mentioned series of letters between it and Emerson in 1967–68. Industrial contends that the absence of any denial by Emerson in response to Industrial's assertions that it expected to be the exclusive distributor constituted an admission by Emerson that Industrial had an exclusive distributorship agreement with Emerson. We disagree.

As this Court noted in *Dorton v. Collins & Aikman Corp.,* 453 F.2d 1161, 1168 n.4 (6th Cir. 1972):

> The common law has never recognized silence or inaction as a mode of acceptance. *See* 1 W. Hawkland, supra, § 1.090301, at 17.

*See also Anders v. Georgetown College,* 286 S.W.2d 78, 79 (Ky.1955); *New Headley Tobacco Warehouse Co. v. Gentry's Ex'r,* 307 Ky. 857, 860, 212 S.W.2d 325, 327 (1948); and *Cincinnati Equip. Co. v. Big Muddy River Consol. Coal Co.,* 158 Ky. 247, 256, 164 S.W. 794, 798 (1914).

We do not hesitate to say that Emerson may have been less than forthright in consistently avoiding the issue of exclusivity, raised by Industrial in its correspondence, but Emerson's unresponsiveness did not in any way amount to an admission that an exclusive distributorship agreement existed between the parties, particularly the relatively complex agreement described by the District Court in its instructions.

Moreover, the evidence indicates that Industrial too may have been less than forthright, as evidenced by its varying assertions of exclusivity. Robert Browning testified that Mivelaz's claims with respect to his purported exclusive territory were "erratic and variable." The following exchange took place on the direct examination of Browning:

Q Has he [Mivelaz] ever claimed 100 miles?

A Yes. And he's gone down to as low as 50. He's gone to the Tennessee border. And then he has defined it by county and then he says it's okay to have stocking distributors in Louisville, such as Neill-LaVielle or W. W. Grainger. But it's not okay to have—and both of those companies have salesmen, but it's not okay to have Machine Drives. So it's so confusing that it really wasn't worth the time to try to get into a discussion about it.

Further, in its letter to Browning Mfg. of March 22; 1968 Industrial sought exclusive rights to sell Browning Gear Reducers only in "the Greater Louisville area." The evidence reveals that Industrial made inconsistent claims relative to the size of its alleged exclusive territory and that it conveniently overlooked the activities of certain smaller area Browning distributors.

Moreover, we note that the language used by Industrial in its correspondence with Emerson indicated that Industrial was not confirming the existence of an exclusive distributorship that it had had in the past, but rather, that it was seeking or expecting such a relationship in the future.

Certain testimony also shows that both Frank Jones, Browning's Vice-President of Sales, and Dorval, Browning's Louisville salesman, told Mivelaz, personally, that Industrial was not an exclusive distributor for Browning. On the cross-examination of Jones the following exchange took place:

---

distributor. At any rate, this statement was not the equivalent of a statement that Industrial was the exclusive distributor in Louisville. As the Supreme Court of Pennsylvania stated in *Dahath Elec. Co. v. Suburban Elec. Dev. Co.,* 332 Pa. 129, 131, 2 A.2d 765, 767 (1938):

> It is said that because plaintiff is referred to as "the dealer" and in certain instances the territory allotted is described as "his territory" or "the dealer's territory," the implication arises that the agency was to be an exclusive one. This by no means follows; the same language could be used if there were other agents in the territory.

288

Q So you were telling Industrial they were still the exclusive?

A No, sir; because Graft-Pelle was still a distributor.

Q But they had maintained in their previous letter they were the exclusive. You didn't tell them they weren't, did you?

A I believe that I had a conversation with Mr. Mivelaz that said, "Bill, you're not the exclusive distributor in Louisville, and we don't have exclusive distributors anywhere in the United States."

Q And he said okay?

A "And we want to work with you."

Q And after that, he said okay?

A We went about our business.

Also, Dorval, upon cross-examination, testified concerning his February, 1973 meeting with Mivelaz, when he informed Mivelaz that Machine Drives was about to open a distributorship as follows:

Q Did you tell Mr. Mivelaz at that meeting that he was not an exclusive distributor for Browning?

A Yes. I—yes, sir. I told him he couldn't have ever been because of Neill-LaVielle being a distributor.

There was also testimony by Robert Browning and James F. Hardymon, Executive Vice-President of the Browning Division, to the effect that the Browning policy was not to have exclusive distributorships with its customers. Robert Browning testified:

[B]y virtue of having multiple distribution the company is in a position to protect its sales through several or multiple distribution outlets as opposed to having to be tied exclusively to a weaker or declining distributor.

As the Court of Appeals of Kentucky stated in *Corbin's Ex'rs v. Corbin,* 302 Ky. 208, 213, 194 S.W.2d 65, 68 (1946):

The general rule is that where the alleged expressed contract is oral the evidence to support it must be clear and convincing.

The evidence offered by Industrial established only that there was at one time an implied distributorship contract between the parties, but there was no evidence which established that the distributorship was intended by the parties to be exclusive. Not only was there no meeting of the minds on the question of exclusivity, but also, as indicated above, there was a fundamental lack of definiteness with respect to the size of the alleged exclusive territory and the duration of the alleged exclusive distributorship.

It is well settled that "to be binding in law, an agreement must be definite and certain." *General Motors Corp. v. Keener Motors,* 194 F.2d 669, 675 (6th Cir. 1952). Clearly the essential terms of the alleged exclusive distributorship agreement failed for lack of definiteness and certainty.

We are of the opinion that Industrial failed to carry its burden of proving the existence of an exclusive distributorship between it and Emerson after 1960 or 1961.

II

Industrial's cross-appeal may be disposed of briefly. We are of the opinion that Industrial did not make out a case against Emerson on its tort claims against Emerson for interference with contractual and economic relations and for libel, and that the District Court properly directed a verdict in favor of Emerson.

Industrial's claims for interference with contractual and economic relations arose from two incidents. The first incident was the alleged participation of several of Emerson's salesmen with Machine Drives in the "sales blitz" on current and potential Browning Division customers in the Louisville area, in June, 1973. This so-called blitz occurred after Industrial's lawyer had written to Emerson, and the sales effort was taken, among other reasons, to assure customers in the area that their needs would be supplied if Industrial terminated the distributorship.

The second incident was Emerson's alleged approval of Machine Drives' letter to its customers in October, 1973, which letter

stated its contention that exclusive contracts of the type Industrial Equipment claimed to have, were illegal due to the antitrust laws.

 As to interference with contractual relationships, this Court in *Davis H. Elliot Co. v. Caribbean Util. Co.*, 513 F.2d 1176, 1182 (6th Cir. 1975), citing a decision of the Court of Appeals of Kentucky, stated:

In Kentucky, intentional interference with a known contractual relationship gives rise to an action in tort, if the interference is malicious or without justification. *Derby Road Building Co. v. Commonwealth*, 317 S.W.2d 891, 895 (Ky. 1958).

*See also Walt Peabody Advertising Serv. Inc. v. Pecora*, 393 F.Supp. 328, 331–32 (W.D.Ky.1975). Two of the necessary elements of this tort are the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party. *Id.* at 331. *See also* Prosser, *Law of Torts* 931 (4th ed. 1971).

In the present case Industrial failed to prove either that it had an exclusive distributorship with Browning or Emerson after 1960 or 1961, or that Industrial had distribution contracts with its customers that were breached because of the sales blitz or Machine Drives' letter. Thus, Industrial did not establish the requisite elements of the tort of interference with contractual relations, and its claim was properly dismissed.

 Industrial also argues that the District Court improperly dismissed its tort claim against Emerson for libel. This claim arose from the letter hereinbefore set forth in full, in which Machine Drives stated that "exclusive contracts of the type Industrial Equipment Co. claims to have are illegal due to the Anti-Trust Laws." Industrial claims that the letter was libelous *per se* on two grounds: first, that this statement implied that Industrial was committing or had committed a crime; second, that the statement maliciously defamed Industrial, which deprived it of patronage or trade.

We need not reach the question of whether this statement was libelous; rather, the statement was made by Machine Drives, and in no way was attributable to Emerson. Nowhere in the letterhead or otherwise did Emerson's name appear. The letter as originally drafted prior to the mailing to Machine Drives' customers, was sent by Thomas Whitton of Machine Drives to Robert Browning of Emerson. Robert Browning suggested a change in the phrase "it is possible that Browning products may not be available through Industrial Equipment Company" which appeared in the first paragraph of the proposed letter. Whitton agreed to the suggestion, and he changed the phrase to read:

. . . there may be some question in your mind about the availability of Browning products and who represents the Browning Manufacturing Division as a distributor.

Emerson made no suggestions as to the second paragraph, which contained the alleged libelous statement, or as to any other part of the letter. Industrial failed to carry its burden of proof that Emerson either ratified, approved, encouraged, or otherwise adopted the alleged libelous statement. Machine Drives wrote and adopted the statement in question and was solely responsible for its content; the fact that Emerson did not prevent Machine Drives from mailing the letter did not constitute ratification on its part. *See also Edwards v. Kentucky Util. Co.*, 289 Ky. 375, 379, 158 S.W.2d 935 (1942), for a similar proposition with respect to master-servant relations. Accordingly, Industrial's libel claim was properly dismissed.

Furthermore, this claim of Industrial against Machine Drives was set forth in the amended complaint in which Industrial sought to recover $200,000 for compensatory and exemplary damages. An agreed order was entered on March 12, 1974, in which Industrial's complaint and amended complaint "are hereby dismissed settled, with prejudice, as to the Defendant Machine Drives," and no rights against Emerson were reserved.

Industrial also argues that the District Court abused its discretion by twice denying Industrial pretrial discovery of the identify of and the amount of sales to Machine Drives' customers. Because this evidence related to Industrial's claims of libel, economic interference, and exclusive distributorship, all claims found adversely to Industrial, we need not pass on this issue, but we do note that the District Court is vested with wide discretion in discovery matters and that there was no showing of an abuse of the Court's discretion.

The judgment of the District Court in favor of Emerson on Industrial's tort claims is affirmed. The District Court's judgment in favor of Industrial on its claim for breach of an exclusive distributorship is hereby reversed and the cause is remanded with instructions to dismiss Industrial's amended and supplemental complaint.