**Arnold LIGON and Herbert Arnold Ligon, Jr., Appellants,**

v.

**George W. PARR, individually, etc., et al., Appellees.**

Court of Appeals of Kentucky.

April 2, 1971.

Rehearing Denied Oct. 22, 1971.

---

Carroll S. Franklin, Franklin & Gordon, Madisonville, for appellants.

John W. Beard, Beard, Rummage & Kamuf, Owensboro, for appellees.

CLAY, Commissioner.

In this suit appellants (hereinafter Ligon, referring to the senior member of the family) sought specific performance of a written option agreement to purchase all the stock of L & B Express, Inc. The Chancellor denied the relief principally on the ground that for want of adequate consideration the contract was lacking in mutuality.

On the trial a great deal of testimony was taken involving various transactions between the parties and others, much of which has nothing to do with the basic issue involved. The agreement sought to be enforced was between Ligon and appellee Parr. It was dated November 23, 1963. Ligon was given an irrevocable option for 10 years to purchase all the stock of L & B. This agreement was part of a series of related transactions, and to put the picture in perspective, it is necessary to summarize the factual situations that then existed and later developed.

Prior to November 23, 1963, appellee Zepernick had acquired all the stock of L & B Express, Inc., a Kentucky corporation. Its liabilities exceeded its tangible assets and Zepernick, an employee of the corporation, was owed approximately $5,000 in back salary. One asset of the corporation of potential value was an ICC trucking certificate, and control of this certificate lies at the root of this controversy. Apparently Zepernick wished to make some arrangement whereby upon a sale of the stock he would be assured of recovering his back salary and be enabled to continue his employment in the trucking business. Ligon, who was the executive officer of another trucking company, was interested in getting control of the corporation.

An abortive sale was made to Ligon's son. Something happened to another sale to another party. Parr became interested in L & B, and at the time the option agreement was entered into, it was contemplated that Parr would buy the stock from Zepernick under an installment payment contract. One of the difficulties of the case is that on the date of the execution of the option agreement between Parr and Ligon, Parr did not own the stock.

Not long thereafter, however, Parr contracted with Zepernick to buy it. The business of L & B prospered, its debts were paid, and for 10 months Parr made the installment payments due (plus more than were currently due). Parr then deliberately defaulted in his payments to Zepernick, apparently with Zepernick's connivance, and, under the terms of that contract, this terminated the latter's obligation to transfer the L & B stock to Parr. In October 1964 Ligon was advised of this, and since that date Parr and Zepernick have taken the position that Ligon's option rights were extinguished. Not long thereafter Ligon assigned his option rights to his son and his son notified Parr that those rights were being exercised. Parr refused to recognize that the option agreement was still binding, hence this lawsuit.

The Chancellor recognized that this default on the part of Parr was contrived for the purpose of extinguishing Ligon's rights under the option contract, but he expressed doubt that Ligon could complain since he had knowledge of Parr's purchase agreement and knew that he could not obtain the stock if the latter defaulted. However, if Ligon's rights were subject to the possibility of Parr's default, and such default actually took place and must be recognized, that would have ended the controversy and there would have been no reason for the Chancellor to consider and determine whether the option contract was void for want of mutuality because lacking in consideration. The Chancellor did not accept this default as determinative of the rights of the parties, nor do we.

■ If Ligon's rights were circumscribed by the purchase agreement between Parr and Zepernick, then Parr was required to act in good faith and could not in fairness lawfully terminate his contract with Zepernick for the purpose of destroying Ligon's rights under the option contract with him. We believe the evidence established that this maneuver between Parr and Zepernick was a rigged transaction to defeat Ligon's rights, that actually there was no default, but even if there was, in equity and good conscience it should not be recognized. The applicable principle is thus stated in Gulf, M. & O. R. Co. v. Illinois Central R. Co., D.C.Ala., 128 F. Supp. 311 (1954):

"A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove."

The rule is stated another way in Mortgage Corp. of New Jersey v. Manhattan Savings Bank, 71 N.J.Super. 489, 177 A.2d 326 (1962):

"Covenants are implied in two situations, one where the covenant is so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and the other where the covenant was probably beyond the pale of conscious thought of the parties but is necessary in order to give effect to and effectuate the purpose of the contract as a whole. Though a court balks at making a contract for the parties, it will, where justice and expediency demand, infuse the contract with a spirit of good faith and fair dealing in order to justify the implication of a covenant which will prevent one party from impairing the right of the other party to receive the fruits of the contract."

In our opinion Parr is not in a position to claim inability to perform, particularly in view of the fact that he and Zepernick were at the time, and subsequently, working together in operating the business of L & B.

■ We finally reach the terms of the option agreement which the parties to this litigation have almost obscured by the interminable testimony and recitals of evidence in their briefs.[1] This agreement consisted of two and one-half typewritten pages prepared by a lawyer. It was executed by Parr as an individual and as *president and sole stockholder* of L & B Express, Inc. Parr granted to Ligon an irrevocable option for a period of 10 years from November 23, 1963, to purchase all the stock of the corporation.

The computation of the price to be paid by Ligon was quite unique. If the option had been exercised the day after the agreement was executed, it would have been $43,273.86. However, pending exercise of the option, this sum was to be reduced at the rate of four percent of Parr's gross

1. Appellees' brief violated RCA 1.210(b) 3 in failing to give record references supporting factual statements.

revenue per month. Obviously, if the business prospered (which it did), the longer Ligon delayed exercise of the option the less he would have to pay. Over a period of time there was a distinct possibility that Ligon would not have to pay a cent for the stock. (In fact, at the time the option was exercised, a substantial amount was due on the purchase price.) We will assume, as the Chancellor apparently found, that the purchase-price arrangement itself did not constitute consideration for Parr's promise.

However, consideration for Parr's promise may be found in two other items. The agreement recites assistance given by Ligon to Parr in the purchase of L & B. The evidence shows that Ligon did perform services for Parr's benefit in arranging the agreement between Parr and Zepernick, in giving Zepernick employment while attempts were being made to rehabilitate L & B, and in having his son relinquish certain rights he had obtained to buy the stock from Zepernick. It may be pointed out here that all parties were interested in the survival of L & B as a profitable concern and Ligon took a leading part in some rather complex transactions which ultimately resulted in successful operations by L & B. These continuing services constituted executed consideration for the agreement. Paragon Oil Co. v. A. B. Hughes & Sons, 193 Ky. 532, 236 S.W. 963 (1922).

Even if the foregoing did not constitute adequate consideration justifying equitable enforcement of this agreement, we do find in section 7 thereof a fixed obligation of Ligon to buy the stock upon the happening of certain events. This section provided that in the event of Parr's death, his widow could request exercise of the option, and if so, Ligon was obliged to make the purchase. For example, if Parr died the day after the option was executed, his widow could forthwith require Ligon to complete the purchase and pay the full purchase price of approximately $43,000. The Chancellor was of the opinion that the happening of these events was speculative, but they could have happened, and Ligon was at all times bound by this promise. It was valuable consideration and was sufficient to make the option contract enforceable.

In the recent case of Hale v. Cundari Gas Transmission Company, Ky., 454 S.W.2d 680 (1970), we re-examined the problem of the lack of mutuality in contracts. Therein we noted that the basic problem is one of reciprocal considerations. An option contract is binding and enforceable against the person giving the option if the other party has furnished a quid pro quo. This may consist of performing services or incurring obligations which constitute either a detriment to the party granted the option or a benefit to the party giving it. As in the Hale case, we have both types of consideration here. In our opinion the court's finding that this option agreement was unenforceable as lacking in mutuality for want of consideration, whether considered a matter of fact, or law, or both, was clearly erroneous.

The Chancellor's findings suggest that in a certain sense Ligon had obtained an unconscionable advantage which a court of equity should not enforce. However, appellees did not attack the agreement on that ground. They pleaded, and are still insisting, that this written instrument was never meant to be binding on anybody, but if so, it lacked consideration.[2] In any event, we do not deem this a sound defense.

It may be true that due to the eventual success of L & B, the advantages that Ligon will realize by its enforcement far exceed those realized by Parr. This, of course, is not the test of validity or enforceability. It is not required that parties have reciprocal rights of the same kind or nature. David Roth's Sons, Inc. v.

---

2. Other defenses, such as fraud and estoppel, appear to have been abandoned.

Wright and Taylor, Inc., Ky., 343 S.W.2d 389 (1961). As said in Simpson on Contracts, 2nd Ed, page 86:

"The fairness of an exchange is legally irrelevant. So long as a man gets what he has bargained for, and it is of some value in the eyes of the law, the courts will not inquire whether it is of any value to him, or whether its value is in any way proportionate to his promise given in return. The reason for the rule is not far to seek. Persons must be free to contract; and it is for the law to enforce the agreement they have made, not to make it or to correct it for them."

See also Restatement, Contracts, section 81.

This brings us to the equities of the case. Appellees argue that Ligon does not come into court with clean hands, but it appears to us on this record that it is the other way around. As heretofore noted, Parr and Zepernick apparently colluded to extinguish Ligon's rights under the agreement with Parr. At the time the testimony was taken in this case, both Parr and Zepernick were doing business together in and through L & B. Although Parr's testimony was equivocal, it appears that Zepernick was operating the corporation principally for Parr's benefit. The latter admitted that he took 75% of L & B's gross receipts and Zepernick 25%.

Though some question is raised as to whether Zepernick ever delivered a stock certificate to Parr, it seems that in actuality the latter has control of this corporation and performance of the option contract properly can be decreed. See Miedema v. Wormhoudt, 288 Ill. 537, 123 N.E. 596 (1919). The reason for granting such equitable relief instead of requiring Ligon to sue for damages is that the value of the L & B stock is unknown and the loss to Ligon cannot be measured in dollars and cents. In our opinion appellants are en-

titled to the relief prayed for in their complaint.

The judgment is reversed with directions to enter a proper judgment for appellants.

All concur.