**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0136n.06
Filed: February 17, 2009

**No. 07-6136**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GERALD GRESH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| WASTE SERVICES OF AMERICA, INC., | ) | EASTERN DISTRICT OF KENTUCKY |
| W. TODD SKAGGS, JAMES P. DALTON, | ) | |
| and RIVER CITIES DISPOSAL, LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: MERRITT, COLE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Gerald Gresh claims that Waste Services of America ("WSA"), two of its corporate officers and an affiliated company fraudulently induced him to refrain from exercising an option to buy WSA stock until after most of the corporation's assets had been sold or transferred. The district court rejected all of his claims as a matter of law. We affirm in part and reverse in part.

I.

In 1995, Bruce Addington and Todd Skaggs created WSA, a landfill-development company. Addington owned 55% of the stock, and Skaggs owned the balance. Because neither Addington nor

Skaggs had extensive experience developing landfills, they invited Gerald Gresh, who had such experience, to join them in the venture. To encourage Gresh, they offered him a stock-option agreement: In exchange for becoming an at-will employee, Gresh would receive an option to purchase up to 50 shares of WSA stock (5% of all authorized shares) for $1,000 per share. Gresh accepted the offer and became a vice president of the company.

Addington eventually left WSA and conveyed all of his stock to Skaggs, making him the corporation's sole shareholder. Soon after Addington's departure, Skaggs began negotiations to sell many of WSA's assets. On June 22, 1998, Skaggs told Gresh that he intended to sell WSA's landfills and that he must discharge Gresh as a result. Skaggs at the same time presented Gresh with a proposed "Agreement and Release," offering to buy Gresh's stock option for $250,000. Gresh rejected the offer and tried to negotiate a better deal. Over the next several months, Gresh and WSA (through Jim Dalton, a vice president with the corporation) tried to negotiate a buyout of Gresh's option. The parties never reached an agreement, and by February 1999 Gresh still had his WSA stock option, unsold and unexercised.

In the midst of these discussions, WSA (apparently unbeknownst to Gresh) negotiated with Liberty Waste Services to sell some of its landfills. WSA and Liberty signed a non-binding letter of intent on June 8, 1998, and after further negotiations the parties signed a binding letter of intent on October 6, 1998. By January 1999, Skaggs had sold several WSA-developed landfills to Liberty and transferred most of the others to affiliated companies he controlled. When Gresh learned in

February 1999 of the sale to Liberty, Skaggs told him that WSA had one remaining asset—a single landfill of little value—making Gresh's option effectively worthless.

Invoking the diversity jurisdiction of the federal courts, Gresh brought six state-law claims against Skaggs, Dalton, WSA and River Cities Disposal, LLC (one of the affiliated companies Skaggs controlled): (1) breach of fiduciary duty, (2) fraudulent nondisclosure, (3) fraudulent misrepresentation, (4) breach of the implied duty of good faith and fair dealing, (5) tortious interference with existing contractual relations and (6) tortious interference with prospective contractual relations. The defendants moved for summary judgment on all six claims, and the magistrate judge recommended that the motion be granted. Over Gresh's objections, the district court adopted the magistrate judge's report and recommendation.

## II.

In addressing Gresh's appeal, we give fresh review to the district court's summary-judgment decision, drawing all reasonable inferences in Gresh's favor. *See Med. Mut. of Ohio v. K. Amalia Enters., Inc.*, 548 F.3d 383, 389 (6th Cir. 2008).

## A.

Gresh first argues that Skaggs breached his fiduciary duties when he sold WSA's landfills without giving Gresh notice and when he transferred other assets to affiliated companies that Skaggs controlled. Yet under Kentucky law, which (the parties agree) governs this case, Skaggs did not owe

Gresh a fiduciary duty. There is no lockstep recipe for ascertaining when a fiduciary relationship exists. *See Abney v. Amgen, Inc.*, 443 F.3d 540, 550 (6th Cir. 2006). But as a "general rule," a fiduciary relationship turns "on trust or confidence reposed by one person in the integrity and fidelity of another" that "necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991); *accord In re Sallee*, 286 F.3d 878, 892–93 (6th Cir. 2002). Certain relationships come to mind: executors of a trust; a joint venture; an attorney-client relationship. *See Bryan v. Sec. Trust Co.*, 176 S.W.2d 104, 107 (Ky. 1943); *Lach v. Man O'War, LLC*, 256 S.W.3d 563, 569 (Ky. 2008)*; Am. Cont'l Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12, 13 (Ky. Ct. App. 1998). On the other side of the line are "ordinary business relationship[s]" and other connections premised on "arm's length" negotiations. *See Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n, Inc.*, 242 S.W.3d 359, 364–65 (Ky. Ct. App. 2007).

The relationship between Gresh and Skaggs falls on the "ordinary business relationship" side of the line. Gresh cannot ground his fiduciary-breach claim on his status as an employee of WSA or on his status as a stock-option holder. Corporate officers generally do not owe fiduciary duties to at-will employees, *see, e.g.*, *Grappo v. Alitalia Linee Aeree Italiane, S.P.A.*, 56 F.3d 427, 432 (2d Cir. 1995), or to option holders, *see, e.g.*, *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 989–90 (S.D.N.Y. 2003); *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 549–50 (D.N.J. 1999); *Powers v. British Vita, P.L.C.*, 969 F. Supp. 4, 5 (S.D.N.Y. 1997).

Nor has Gresh established a cognizable basis for concluding that his relationship with Skaggs and WSA went beyond the at-will-employee status described in his stock-option agreement. Yes, an affidavit signed by Addington says that he, Skaggs and Gresh orally agreed that they were "essentially partners, or co-owners," JA 795, that they would work in each other's best interests and that they would resist pursuing any landfill opportunity to the exclusion of the other two. Yet whatever oral arrangements the parties may have had, the parol-evidence rule prohibits Gresh from using (and bars us from considering) Addington's affidavit to establish the existence of a "broader, oral agreement," Reply Br. at 26, that overrides the terms of the stock-option agreement. In signing the stock-option agreement, Gresh "acknowledge[d] that he [was] an at-will employee of [WSA]" and agreed that his option did nothing to "alter, add to, or change" his at-will-employment status. JA 597 (internal quotation marks omitted). No less importantly, the agreement included an integration clause, which said that the contract "constitute[d] the entire agreement of the parties," and that no "oral or implied agreement or representations" other than those set out in the agreement could bind WSA or Gresh. JA 598. Gresh's efforts to elevate the relationship to a de facto partnership thus directly conflict with the agreed-upon terms of the stock-option agreement and the integration clause, precluding us (or a jury) from invoking the Addington affidavit to establish the existence of a "broader, oral agreement." *See Akins v. City of Covington*, 97 S.W.2d 588, 590 (Ky. 1936); *Caudill v. Acton*, 175 S.W.3d 617, 620 (Ky. Ct. App. 2004).

The collateral-contract exception to the parol-evidence rule offers Gresh no refuge either. A party to a written agreement, sure enough, may rely on parol evidence to prove the existence of

a separate contract—one "independent of, collateral to, and not inconsistent with, the written contract," *Tex. Gas Transmission Corp. v. Kinslow*, 461 S.W.2d 69, 71 (Ky. 1970) (internal quotation marks omitted). But that is not what is going on. Gresh seeks to establish the existence of a "broader, oral agreement" by which he was "essentially [a] partner[] or co-owner[]" in WSA—an agreement in other words that contradicts the stock-option contract. JA 795. The district court correctly rejected Gresh's fiduciary-breach claim as a matter of law.

B.

Gresh next argues that WSA and Skaggs fraudulently failed to disclose several facts to him: (1) the full details concerning the sale of WSA assets to Liberty, including the timing, price and terms of the deal, (2) Skaggs' intent to transfer a WSA-developed landfill to another company that he controlled and (3) Skaggs' assumption of over $6 million in debt WSA owed to Addington. In alleging fraud by omission, Gresh must do more than show that, as a matter of best-business practices, Skaggs should have disclosed this information—true though that may be. He must show that Skaggs (or WSA) owed him a duty to disclose it: (1) because Skaggs owed a fiduciary duty to Gresh, (2) because a statute imposed such a duty, (3) because Skaggs had superior knowledge about facts essential to the transaction and Gresh reasonably relied upon him to disclose that knowledge or (4) because Skaggs partially disclosed relevant facts, making what was said and left unsaid materially misleading. *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003); *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998); *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999). When the first circumstance (a

fiduciary duty) does not exist, the courts have been careful not to apply the other three circumstances so broadly as to transform everyday, arms-length business transactions into fiduciary relationships. *Cf. Quadrille*, 242 S.W.3d at 364–65; *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996); *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 911 (10th Cir. 2005).

The first two grounds do not apply. Skaggs and Gresh did not have a fiduciary relationship, as we have explained, and Gresh does not maintain that any statute created a duty to disclose.

A superior-knowledge duty of disclosure also does not apply. In "particular circumstances," the Kentucky courts have recognized that a seller may be obligated to disclose known risks or defects that a reasonable buyer would want to know and that he could not discover through ordinary diligence. *Smith*, 979 S.W.2d at 129. For example, a seller of a car may have a duty to disclose material defects known to it, *id*., a party commissioned to drill for water may have a duty to disclose that the water might not be potable, *Faulkner Drilling Co., Inc. v. Gross*, 943 S.W.2d 634, 638 (Ky. Ct. App. 1997), and a seller of property may have to disclose a latent defect in it, *Bryant v. Troutman*, 287 S.W.2d 918, 921 (Ky. 1956). Consistent with the *Restatement of Torts*, which the Kentucky courts generally follow, *see, e.g.*, *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758 (Ky. 2004); *Louisville Gas & Elec. Co. v. Roberson*, 212 S.W.3d 107, 111 (Ky. 2006); *United Parcel Serv.*, 996 S.W.2d at 469; *but see Steel Techs., Inc. v. Congelton*, 234 S.W.3d 920, 929 (Ky. 2007) (not following Restatement approach for tort of negligent infliction of emotional distress), the failure to disclose also must be "so shocking to the ethical sense of the community, and . . . so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a

bargain that is a trap, of whose essence and substance he is unaware." *Restatement (Second) of Torts* § 551 cmt. l.

Neither Skaggs' nor Dalton's actions rise to that level or to the level of the cited cases. At the June 22 meeting, Skaggs discharged Gresh, told him that he was going to sell WSA, then made an offer to buy Gresh's stock option. Dalton tried to negotiate an appropriate price for the option with Gresh over the next several months—at one point raising the offer by $65,000—and several times presented him with proposed contracts stating that WSA "has been discussing . . . the possible sale of the assets or stock of WSA," JA 621, 627, 923, 936.

The key information that Gresh needed to protect himself thus was disclosed at the June 22 meeting. And while Skaggs possessed other information that he did not disclose, Gresh has not shown that he lacked sufficient information and time to protect his interests in the option, which by definition has a value that may go up or down from day to day. It is the rare commercial relationship that does not involve one party with *some* knowledge advantage over the other, and in many business transactions *each* party will believe it has superior knowledge of what the commercial future will bring, which is frequently what motivates the deal, be it the sale of a business or the purchase of a share of stock. *Cf. Restatement (Second) of Torts* § 551 cmt. k ("To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability."); *id*. § 551 illus. 8 (seller who is aware that chattel is worth far less than the buyer thinks it is worth is not obligated to disclose that knowledge to the buyer).

Skaggs' disclosures to Gresh during the June 22 meeting—that WSA planned to sell its landfills and that Gresh's option was worth $250,000—also did not trigger a duty to disclose additional information about these topics. Speaking about a particular topic during a business negotiation does not, by itself, obligate the speaker to disclose everything else he knows about the topic. Only when a partial disclosure makes the spoken words materially misleading does the omission become actionable. *See Restatement (Second) of Torts* §§ 529, 551(2)(b); *United Parcel Serv.*, 996 S.W.2d at 469 (relying on § 529 of the Second Restatement); *In re Sallee*, 286 F.3d at 896.

Skaggs' statement that he intended to sell WSA did not give rise to a duty to disclose the details of the Liberty deal (or his intent to transfer a WSA-developed landfill into another corporate entity) because the omission of those details did not make Skaggs' statement to Gresh misleading. Skaggs truthfully told Gresh that he was going to sell WSA, and he did. The statement itself was not a half-truth likely to lead Gresh astray but rather a direct and honest expression of what Skaggs intended to do: sell the corporation.

A similar conclusion applies to Skaggs' representations about the value of Gresh's option. While Gresh does not develop the argument, devoting less than a full sentence to it, the idea appears to be that Skaggs' representation that the option was worth $250,000 contained an actionable omission—that Skaggs' assumption of WSA's debt to Addington effectively increased the value of the option. The problem with this argument, as we explain in more detail below in addressing a related fraudulent-misrepresentation claim, is the absence of reasonable reliance. *See United Parcel*

*Serv.*, 996 S.W.2d at 469 (indicating that a plaintiff must establish reliance to succeed on a fraud-by-partial-disclosure claim); *Rivermont Inn*, 113 S.W.3d at 641 (stating that one element of a fraud-by-omission claim is that the defendant's failure to disclose the material fact induced the plaintiff to act or refrain from acting). When asked in his deposition why he did not exercise the option, Gresh explained only that he preferred to negotiate with WSA for a better deal. Gresh never said that he continued to negotiate, rather than exercise his option, based on Skaggs' estimation of the corporation's or the option's worth. All of Gresh's actions after the June 22 meeting confirm that he believed that his stock option was worth *more* than the $250,000 WSA initially offered him, which is why he negotiated for a higher price and why Skaggs eventually offered a higher price, though apparently not a high enough price. In the absence of reliance, this claim fails as a matter of law.

C.

Gresh next argues that Skaggs and Dalton made six fraudulent misrepresentations to him in the course of the negotiations. To establish fraud, Gresh must establish with clear and convincing evidence that, in taking or refraining from taking an action, he reasonably relied on a representation that was material, false, known to be false or made recklessly, and made with the intent of inducing him to act or refrain from acting. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993); *Ross v. Powell*, 206 S.W.3d 327, 330 (Ky. 2006); *United Parcel Serv.*, 996 S.W.2d at 468. One of the six statements meets this standard; the other five do not.

*First*, at some point in early October 1998—in the midst of ongoing negotiations with WSA regarding the option buyout—Gresh asked Dalton about the status of Skaggs' plans to sell WSA. Yet, in October 1998, Dalton—whom Skaggs had given the responsibility of negotiating the buyout of Gresh's option—told Gresh that "nothing . . . had crossed [his] desk" concerning plans to sell the corporation. JA 687 (internal quotation marks omitted). Whether Dalton made that statement in his individual capacity, in his capacity as a representative of WSA or as an agent of Skaggs, a jury reasonably could conclude that the representation was fraudulent.

WSA entered into a non-binding letter of intent with Liberty on June 8, 1998, and it entered into a binding letter of intent on October 6, 1998. Skaggs executed both documents on behalf of WSA. Having negotiated with Liberty for nearly four months, Skaggs could not represent truthfully to Gresh in early October 1998 that there were no plans to sell the corporation. And Dalton, the treasurer and vice president of WSA, cannot show that he had no knowledge of Skaggs' plans to sell most of WSA's assets to Liberty. The record shows that, on September 18, 1998, Dalton faxed information about four WSA-developed landfills to a corporate officer at Liberty, and by at least October 5 Dalton was aware that Liberty was conducting due-diligence investigations at WSA's landfills.

Resisting this conclusion, the defendants argue—and the district court held—that it was unreasonable as a matter of law for Gresh to rely on Dalton's representation that he was unaware of any plans to sell the company. Not true. As vice president and treasurer, Dalton was the second highest-ranking officer at WSA. And as the corporate officer tasked with negotiating the buyout

of Gresh's stock option, Dalton gave Gresh a reasonable basis for believing that he spoke for WSA. Gresh and Dalton had been in continual communication for several months regarding the buyout of the option, and each time Gresh called WSA during the negotiations the company referred him to Dalton. A jury could fairly conclude that Gresh reasonably relied on Dalton's representation.

Kentucky's five-year statute of limitations for fraud claims also does not defeat this claim. *See* Ky. Rev. Stat. Ann. § 413.120(12). The statute of limitations began to run when Gresh discovered the fraud or reasonably should have discovered it. *See id*. § 413.130(3); *Madison County v. Arnett*, 360 S.W.2d 208, 210 (Ky. 1962). Gresh did not discover the falsity of this statement until February 1999, when he learned about the Liberty sale from a trade publication, and no one offers any tenable argument why he should have discovered it earlier. Because Gresh included this claim in his original complaint, which he filed in October 2003, the statute of limitations does not bar it.

*Second*, at the June 22 meeting, Skaggs told Gresh that he had discussed the sale of WSA with "a number of parties." JA 947. Gresh argues that this representation was fraudulent because Skaggs had talked to one potential buyer—Liberty—and had entered into a non-binding letter of intent that prevented WSA from negotiating with other entities. But in fact Skaggs testified that over the relevant period of time he did talk to several different entities about the possible sale of WSA, and Gresh points to no record evidence contradicting that account.

Even if Gresh could produce such evidence, he has not shown that Skaggs made these statements to induce Gresh to hold tight in exercising his option. Gresh's theory is that, by

misrepresenting the seriousness of the Liberty negotiations—by telling Gresh that WSA was talking to several potential buyers when it was in serious negotiations with just one—Skaggs sought to dissuade Gresh from exercising his stock option until most of WSA's assets had been sold. But if that were Skaggs' intent, why would he tell Gresh anything about his intention to sell the corporation? By telling Gresh of his plans to sell WSA's assets, Skaggs put Gresh on notice of the key fact that could affect the value of his option: a sale of some or all of the assets.

*Third*, Gresh argues that Skaggs' representation that WSA was "worth $13 million" was fraudulent because WSA was worth far more than that. Yet Gresh has not come forth with evidence showing that Skaggs' representation was false. Gresh points to the non-binding letter of intent in which Liberty proposed to buy WSA for $29 million. But, as Skaggs explained, the $13 million figure represented only a portion of the deal with Liberty. Some of the other assets involved in the sale were owned by Skaggs' other companies. Indeed, when the parties completed the sale in January 1999, WSA received just over $13 million for the assets it sold to Liberty.

Even if Gresh could show that the representation was false, he has not presented any evidence that he relied on Skaggs' approximation of WSA's value in choosing not to exercise his stock option. The "essence" of a fraud claim is "the belief in and reliance upon the statements of the party who seeks to perpetrate the fraud." *Wilson v. Henry*, 340 S.W.2d 449, 451 (Ky. 1960). Yet when asked in his deposition why he did not exercise the option, Gresh explained only that he preferred to negotiate with WSA for a better deal. Gresh never said that he continued to negotiate, rather than exercise his option, based on Skaggs' estimation of the corporation's worth. Gresh's deposition

testimony also shows that during the negotiations he clearly believed the company was worth *more* than $13 million, which is presumably why he opted to prolong the negotiations, turning down offers of $250,000 and $315,000, and making counteroffers substantially in excess of those amounts. Because Gresh has not offered any evidence—much less clear and convincing evidence—that he believed Skaggs' representation or relied on it in making business decisions, this fraud claim fails for this reason as well.

*Fourth*, Gresh cannot base a fraud claim on Skaggs' representation that Gresh's stock option was worth approximately $250,000. Gresh's entire course of conduct after the June 22 meeting flowed from his belief that his stock option was worth *more* than the $250,000 WSA initially offered him. As his actions confirm, he never viewed WSA's $250,000 offer as an authoritative appraisal of its value but merely as an opening offer in a negotiation, an offer that he anticipated would go up, an offer that did go up but an offer that apparently did not go up enough.

*Fifth*, in December 1998, Dalton told Gresh that Skaggs "wanted to wait" before continuing negotiations for the sale of Gresh's option. JA 701. With the closing of the Liberty sale only a month away, Gresh argues, that statement was materially misleading. This claim runs aground because this statement, too, was not false. Even if Dalton and Skaggs were trying to keep Gresh in the dark about the Liberty sale in the hopes that he would not exercise his option prior to the sale, that proves that Dalton's statement that Skaggs "wanted to wait" before continuing negotiations was true: Skaggs indeed "wanted to wait" until the Liberty sale was completed.

- 14 -

*Sixth*, in February 1999, Skaggs told Gresh that "all the landfills were sold on January 1, 1999," save for one that had no significant value. JA 721. That statement was fraudulent, Gresh argues, because two of the landfills developed by WSA were not "sold" but transferred into two separate entities controlled by Skaggs. This claim fails because Gresh does not identify any relevant action he took (or refrained from taking) in reliance on Skaggs' representation. Gresh, true enough, did not exercise his stock option, but this statement was hardly the reason. That WSA's assets had been sold—as opposed to transferred to other corporate entities—should have *encouraged* Gresh to exercise his option, for presumably WSA would have received something of value in return.

## D.

Gresh next argues that WSA breached an implied duty of good faith and fair dealing. To recover on this theory, Gresh had to show that WSA acted in bad faith in denying him the benefits intended by the agreement, without regard to whether WSA violated the agreement. *See Farmers Bank & Trust Co. of Georgetown v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *Ligon v. Parr*, 471 S.W.2d 1, 2–3 (Ky. 1971); *see also O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457–58 (6th Cir. 2005). WSA breached that duty, a jury could reasonably find, when Dalton told Gresh that nothing had "crossed [his] desk" concerning a possible sale of WSA.

In many respects, it is true, WSA dealt fairly with Gresh: Skaggs told him at the June 22 meeting that he was going to sell WSA, he offered a price for the option, and every contract that WSA sent to Gresh offering him a buyout of his option referred to the fact that WSA had been

discussing the sale of some or all of the corporation's assets. But Dalton's false assurance that no sale was imminent prevented Gresh from protecting his interest in the value of the option and did so at the one point when Gresh seemed to be aware of the impact such a sale could have on its value. Even though WSA had been negotiating with Liberty for nearly four months and had executed a binding letter of intent with Liberty in early October—calling for a December 1998 closing date—WSA falsely led Gresh to believe that a sale of the corporation was not imminent and that he could safely continue to negotiate the buyout of his option without fear of losing everything. Some businesses, we appreciate, wield sharp elbows, and sometimes there is nothing the courts can do about it except to invoke the timeless (and frequently ignored) warning of caveat emptor. But when Gresh, an option holder, asked about the status of Skaggs' plans to sell WSA, the common-law duty of good faith required WSA either to be straight with Gresh or to say nothing at all. By telling Gresh that a sale was not imminent, WSA deprived Gresh of the benefit for which he bargained: the chance to exercise his option while it was worth something. *Cf. Ligon*, 471 S.W.2d at 3–4.

E.

Gresh next argues that Skaggs and Dalton tortiously interfered with the contract between him and WSA. The district court properly granted summary judgment on this claim for one basic (and good) reason: Gresh has not identified a contract between him and WSA that WSA breached, and Kentucky law requires a breach in order to bring such a claim. *See Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir. 1977) ("Two of the necessary elements of [the tort of intentional interference with an existing contractual relationship] are the existence of a contract

between the plaintiff and a third party and a subsequent breach of the contract by the third party.");

*Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 532 (Ky. Ct. App. 2005).

WSA never breached the stock option agreement and, as explained above, the parol-evidence rule

defeats Gresh's attempt to establish the existence of some "broader, oral agreement" among him,

Addington and Skaggs.

F.

Also unavailing is Gresh's tortious-interference-with-*prospective*-contractual-relations claim.

To succeed, Gresh must (1) identify a prospective contractual relation (2) that defendants interfered

with and (3) establish that the interference was "intentional[] and improper[]." *Restatement (Second)*

*of Torts* § 766B; *see also Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857–58 (Ky.

1988) (adopting Second Restatement's approach). Gresh proffers that he had a "prospective

contractual right . . . to own 5% of the solid waste opportunities developed by WSA." JA 69. Yet

the terms of the stock-option agreement—which gave Gresh the option to own 5% of the *stock in*

WSA—do not support this contention, leaving Gresh again to invoke unsuccessfully his "broader,

oral agreement" among Skaggs, Addington and him. No evidence shows that the defendants

interfered with Gresh's ability to acquire 5% of the stock in WSA. Gresh admits that he could have

exercised his option at any time, and when he exercised his option in 1999, WSA complied with the

terms of the agreement, giving Gresh one share of WSA stock for $1,000. Gresh simply has not

identified any affirmative action WSA, Skaggs, Dalton or River Cities took to obstruct or restrict his

ability to exercise his option and acquire stock in WSA.  Because he cannot show actual interference,

the district court properly granted summary judgment on this claim.

III.

For these reasons, we affirm in part, reverse in part and remand for further proceedings.