JASPER C. GOULD AND OPAL W. GOULD, HIS WIFE, PLAINTIFFS-APPELLANTS, v. AMERICAN WATER WORKS SERVICE CO., INC., A CORPORATION, AND THE BERNARDS WATER COMPANY, A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.

Argued May 6, 1968—Decided June 28, 1968.

*Mr. Burtis W. Horner* argued the cause for appellants (*Messrs. Stryker, Tams & Dill,* attorneys).

*Mr. Sidney P. McCord, Jr.* argued the cause for respondent The Bernards Water Company (*Messrs. McCord, Farrell, Eynon & Munyon,* attorneys).

The opinion of the court was delivered

PER CURIAM. The issue here is whether plaintiff, Jasper C. Gould, has a cause of action for damages against defendant The Bernards Water Company in *quasi* or implied contract based upon alleged unjust enrichment resulting from defendant's appropriation and use of information developed through plaintiff's efforts and skill in locating underground water wells. The trial court decided that the evidence created a jury question on the subject and the jury found for plaintiff Jasper Gould. The complaint against defendant American

Water Works Service Co., Inc. was dismissed and has not been appealed. The Appellate Division, in an unreported opinion, reversed, holding that plaintiff was a mere volunteer and that no legal basis existed for imposing a *quasi*-contractual liability on defendant. We granted certification. 51 *N. J.* 182 (1968).

Plaintiff Jasper C. Gould is an experienced well digger. Defendant is a public utility engaged in the business of selling water to the public in Bernards Township and other localities. In 1953 plaintiff learned from a friend of many years standing, one Burd, who was in defendant's employ as a superintendent, that the company was interested in developing an additional water supply. Upon Gould's inquiry, Burd indicated the company's interest was in wells which would yield 200 to 225 gallons of water a minute. Gould asked also what the company would be willing to pay for such a well. Burd replied he was not the "boss" but he knew it would pay a fair price. Nothing further was said. The friendship between Gould and Burd was purely social. They had had no business relationships. Some time later Burd asked Gould if he would be gracious enough to talk with defendant's geologist. Gould agreed and spent two days with the geologist showing him wells Gould had dug on his own property and discussing conditions he encountered in doing so.

Thereafter, in the latter part of 1953 or early 1954, Gould spent some time drilling a well on five acres of land he owned in Bernards Township. At a depth of 365 feet the well delivered only 60 gallons a minute, so he abandoned it. He moved his equipment 80 feet farther in on his property and began to drill again. This time, after going down 670 feet, he located water and the well yielded over 200 gallons per minute. A short time later, at a social gathering, Gould told Burd he had a very good well and inquired as to whether the company would be interested in seeing a pump test on it. Burd said he would find out from his superiors, and a few days later he advised Gould his superiors would like to have such a test. In April 1954 the test was made. It revealed

the well was yielding over 300 gallons a minute. In another conversation with Gould, Burd said the well was not large enough to admit defendant's pumping equipment and asked what it would cost to enlarge it from six to ten inches. It is undisputed that Gould never furnished a figure. Instead he proceeded to ream the well to a 10-inch diameter for a depth of 250 feet. He admitted that nobody connected with the water company asked him to do so.

Later in 1954, how much later does not appear, Gould met with Burd's superiors who offered $12,000 for the well. There was no discussion about whether the offer was for title to the land or an easement. The conference was a short one because Gould asked for $100,000. About a year later defendant offered $12,000 to $13,000. It was again rejected. Some time later in 1955 or in 1956 Gould reduced his asking price to $50,000, but defendant was not interested. Finally about five years later, in 1960 or 1961, defendant offered $16,000 and Gould lowered his figure to $35,000. The negotiations ended on that note and no agreement was ever reached.

Gould conceded that no representative of defendant asked or authorized him to dig a well or to prospect for water in its behalf, or ever agreed that if he dug a well which produced water at the rate of 200 gallons a minute the company would buy it from him. It appeared also that in a pretrial deposition he said:

> "Q. What was the purpose in drilling this well (meaning the second well)?
> A. It was speculative on my part. For the water company.
> Q. You mean for the water company?
> A. Yes.
> Q. Did you drill it for the water company?
> A. Yes.
> Q. Who asked you to drill it for the water company?
> A. Nobody.
> Q. In other words, you drilled the well in anticipating that you would sell it to the water company?
> A. Yes.
> Q. That's what you were speculating on?
> A. Yes."

In August 1961 defendant acquired property on the south side of Route 202 opposite Gould's acreage and began to dig 490 feet from Gould's well. In March 1962, eight years after completion of Gould's second well, defendant's digging reached 1450 feet in depth and produced sufficient water to move defendant to obtain a permanent diversionary permit from the State Division of Water Policy and Supply to divert up to 500,000 gallons of water a day from the well. About a year later plaintiff brought this action seeking damages from the water company. He alleged that defendant had been unjustly enriched as the result of plaintiff's well-digging activity and the knowledge defendant acquired thereby that water was to be found in the immediate area to an extent which defendant, as a seller of water to the public, was interested in locating and acquiring. More specifically, plaintiff claimed that defendant had encouraged him to dig wells to locate water of the volume desired. Thus when he dug such a well, and informed defendant of the location, defendant's failure to buy it coupled with the subsequent use of the information as the incentive for acquiring nearby property and digging a sufficiently productive well of its own, unjustly enriched defendant at plaintiff's expense. Therefore, plaintiff contended, in order to do justice the law ought to impose an obligation on defendant to pay plaintiff for the expenses and losses resulting from defendant's inequitable conduct.

After consideration of the entire record, we agree with the Appellate Division that plaintiff's proof fails to establish a claim upon which relief can be granted. We concur in its declaration:

"The evidence is uncontradicted that what the plaintiff did was not done at the request of Bernards nor with any expectation at that time that he would be reimbursed by Bernards for his well digging expenses. Plaintiff * * * [Gould] dug the two wells on his property on his own initiative in the hope that if he were successful in finding an adequate water supply, he would be able to negotiate for a sale of the well or an interest in his property to the water company. The fact that the drawn-out negotiations were unsuccessful because the

parties did not agree on a price affords no basis for imposing a *quasi*-contractual liability on defendant, nor is such basis to be found in the fact that defendant thereafter dug its own well approximately 500 feet away to a depth almost twice that of plaintiff's well. See *Restatement*, Restitution, § 2, *p.* 15; § 112, *p.* 461; § 41, *p.* 162 (1937)."

In our judgment the plaintiff occupied the status of a volunteer who hoped that if his efforts produced a result which would interest defendant, an agreement to sell that result to defendant could be consummated. The fact that plaintiff knew defendant was interested generally in locating an additional water supply in the area would not transform his status from volunteer into an obligee when he found a source which defendant could use. Nor would the fact that defendant offered to buy the well at its price make it an obligor. And, although the act of negotiating to buy under the circumstances would not affect the legal relationship between them, it may be noted that no evidence was adduced to show that defendant did not act in good faith during the prolonged voluntary bargaining with plaintiff for the purchase of the well plaintiff had dug. Obviously plaintiff fixed an exorbitant price. Its sharply downward course from $100,000 to $35,000, roughly a drop of two-thirds of the original figure, over a period of *about seven years,* particularly in light of the water company's modest upward course of $12,000 to its final offer of $16,000, leaves no other fair inference. When the negotiations broke off, it meant that plaintiff's speculative venture had failed to achieve its ultimate purpose. If it is assumed that defendant had learned from plaintiff's unsolicited efforts that there was substantial underground water in the area, and to that extent was the recipient of a benefit, such enrichment should not be regarded as unjust enrichment creating a liability for plaintiff's expenses and losses simply because defendant, encouraged by plaintiff's experience, acquired nearby property, dug a well about 500 feet from that of plaintiff and more than twice as deep, and located an acceptable additional supply of water.

Accordingly the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.