QUADRILLE BUSINESS SYSTEMS,
Appellant/Cross–Appellee

v.

KENTUCKY CATTLEMEN'S ASSOCIATION, INC., Appellee/Cross–Appellant.

Nos. 2005–CA–002621–MR,
2006–CA–000009–MR.

Court of Appeals of Kentucky.

Dec. 28, 2007.

D. Berry Baxter, LaGrange, KY, for appellant/cross-appellee.

Christopher W. Brooker, Gregory S. Berman, Deborah H. Patterson, Louisville, KY, for appellee/cross-appellant.

Before MOORE and THOMPSON, Judges; GRAVES,[1] Senior Judge.

## OPINION

THOMPSON, Judge.

Quadrille Business Systems (Quadrille) filed this action against the Kentucky Cattlemen's Association (Cattlemen's) for alleged breach of contract, breach of good faith and fair dealing, and fiduciary duty. The Oldham Circuit Court granted Cattlemen's motion for summary judgment on all claims asserted but permitted Quadrille to submit a claim for quantum meruit to the jury. The jury returned a verdict for $22,093.50 in favor of Quadrille.

Quadrille contends that: (1) the terms of the contract are definite and certain; (2)

---

1. Senior Judge John W. Graves sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

the damages caused by the breach are certain and substantial; (3) it did not waive the alleged breach; (4) Cattlemen's breached a duty of good faith and fair dealing owed to Quadrille; (5) Cattlemen's breached its fiduciary duty owed to Quadrille; (6) the statute of frauds does not preclude the enforcement of the contract between the parties; and (7) the trial court erroneously instructed the jury on quantum meruit. Cattlemen's complains that the jury's verdict was palpably and flagrantly against the evidence. We affirm the summary judgment but hold that the trial court erroneously denied Cattlemen's motion for directed verdict on the quantum meruit claim.

Cattlemen's is a non-profit organization whose members are Kentucky cattle farmers and is comprised of 92 volunteer chapters with members in all 120 Kentucky counties. It provides continuing education to farmers, facilitates communication between cattle farmers and oversees education programs for young people with an interest in agriculture. To further its purposes, in 1999, Cattlemen's began preparation of a grant proposal to submit to the Kentucky Agricultural Development Board (Board).[2] Upon receipt of the grant, Cattlemen's planned to establish the Kentucky Beef Network to coordinate the education and marketing efforts of Kentucky's beef producers.

In 2000, Greg Schoettmer, Mike Carlson, and Fred Speyerer learned that the Board was established to distribute tobacco settlement money. The three entrepreneurs established Quadrille, and Schoettmer began developing a proposal to the Board seeking money to establish and administer a cattle cooperative and a computer tracking system to track Kentucky cattle from birth through slaughter. The three owners had no prior experience in the business they proposed and, as a for-profit company, the Board would require Quadrille to contribute a dollar-for-dollar match for any grant received. In contrast, a non-profit organization was not required to contribute any funds. Thus, in the summer of 2000, Quadrille approached Cattlemen's to establish a business relationship to jointly apply for a grant from the Board.

After numerous meetings, in February 2001, the parties again met. At this time, Quadrille contends that it and Cattlemen's entered into an oral agreement to proceed together to solicit funds from the Board. It recites the terms of the alleged contract as follows:

1. QBS (Quadrille) and the KCA (Cattlemen's) would cease their independent efforts to obtain funds from the Board and work together "as a team" to obtain funds from the Board.

2. QBS would be in charge of the "business and technology" efforts to include all efforts related to the cooperative and the "computer system."

3. QBS would be in charge of the business plan and proposal that would be submitted to the Board.

4. The KCA would be responsible for the "cow side of things" to include the Kentucky Beef Network.

5. As a non-profit organization, the KCA would initially receive the funds granted by the KADB (Board) and forward those funds allocated to the line items associated with the

---

**2.** The Board was formed to disburse funds received from the settlement of the tobacco company litigation to assist Kentucky tobacco farmers develop alternative agricultural interests.

"computer system" and producers' cooperative to QBS.

Cattlemen's denies that there was such an agreement; however, with an approaching deadline of March 1, 2001, to submit the proposal, it admits that Cattlemen's and Quadrille agreed to merge their proposals.

Because of his business expertise, Schoettmer drafted the proposal which included a funding request for the Kentucky Beef Network as well as funding for the computer tracking system and the cooperative that Quadrille would manage. Additionally, the plan requested a grant of $1,100,000 to reopen the Dawson–Baker packing plant in Louisville and $1,000,000 for the Kentucky Forage and Grassland's Council. It set forth a five year-plan, the first phase of which was the establishment of the Kentucky Beef Network to be absorbed by the cooperative within three years. The entire funding request for the proposal totaled $10,919,672.30.

After the proposal was submitted, Cattlemen's representatives, John Stevenson and Charlie Miller, met with the Board's representatives, including Gordon Duke. After the meeting, Stevenson called Schoettmer and told him that Duke had stated that the funds would not be granted without the deletion of all proposals except that pertaining to the Kentucky Beef Network. In response, Schoettmer told Stevenson to do whatever Duke instructed, but that he would not work on the revision of the proposal. Schoettmer testified that he subsequently learned that Duke did not expressly state that only the Kentucky Beef Network was acceptable in the proposal.

The proposal was rewritten by Cattlemen's and it obtained $1,811,000 for the establishment of the Kentucky Beef Network.

Quadrille filed this action alleging that Cattlemen's breached its contract, its duty to act in good faith and deal fairly, and its fiduciary duty when it removed the request for funding for the cooperative and computer tracking system from its proposal to the Board. As a result, it sought $1,811,000 in damages representing the amount received by Cattlemen's and additional damages of $400,000. The trial court granted Cattlemen's motion for summary judgment on all of Quadrille's claims. However, it ruled that Quadrille could proceed to trial on a claim for quantum meruit recovery.

Cattlemen's denies that it entered into a binding contract with Quadrille for either Schoettmer's work on the proposal or for the use of the grant funds. Instead, it contends that Schoettmer rendered his services in exchange for the opportunity to bootstrap Quadrille's grant request to that of Cattlemen's. It is further contended that even if Quadrille is correct as to the content of the parties' conversation in February 2001, the terms of the alleged contract are so indefinite that it cannot constitute a legally enforceable contract. We agree.

In *Lewis v. B & R Corporation,* 56 S.W.3d 432, 436 (Ky.App.2001), this court addressed the proper standard of review in appeals from summary judgments:

The standard of review on appeal when a trial court grants a motion for summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor. The moving par-

ty bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present at least some affirmative evidence showing that there is a genuine issue of material fact for trial. The trial court must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. (internal citations and quotations omitted).

We have examined the record and conclude that the trial court properly granted summary judgment.

■ To be legally enforceable, an agreement must "contain definite and certain terms setting forth promises of performance to be rendered by each party." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky.1997). As the court in *Auto Channel Inc. v. Speedvision Network LLC*, 144 F.Supp.2d 784, 790 (W.D.Ky.2001) stated:

In Kentucky, Plaintiffs must show that an actual agreement existed between the parties with clear and convincing evidence. *Industrial Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 288 (6th Cir.1977). While the agreement need not cover every conceivable term of the relationship, it must set forth the "essential terms" of the deal.

Schoettmer's description of the alleged contract's terms demonstrates its lack of specificity and definiteness. He admitted that there was no agreement as to the compensation for his work on the proposal and, in fact, rejected any payment stating that his interest was in developing a business from the funds received. However, he was well aware that no funds would be received if the grant was denied. Moreover, if as Quadrille suggests, the parties contemplated a multi-million dollar grant from which each would fund their efforts, the alleged contract omits crucial terms. Notably absent are terms as to when and

how the money would be distributed to the respective parties, the specific responsibilities of each party, and the organizational structure of the proposed businesses.

■ A sound reason for the requirement that the terms of a contract be clear and definite is so that the court can measure the damages in the event of its breach. *Kovacs*, 957 S.W.2d at 254. Again, Schoettmer's testimony is the most damaging to Quadrille's claim. When asked if Schoettmer would admit that it was speculation that Quadrille would have been awarded the $1,800,000 he replied: "As much as it's speculation for them to say I wouldn't have been. I agree that both sides are speculative." There is no testimony from any Board member indicating that but for Cattlemen's action, Quadrille would have been awarded the grant. Moreover, there is no evidence as to the profit to be made by Quadrille from any funds which may have been awarded. In summary, the amount of damages would be based on nothing more than speculation and conjecture.

■ Because we find there was no enforceable contract, we do not address the statute of frauds issue or whether Quadrille waived any right to insist that the cooperative and computer tracking system remain in the proposal. Because there is no contract, Quadrille's claim that Cattlemen's breached a duty of good faith and fair dealing requires little discussion. Under Kentucky law, in the absence of an underlying contract, no covenant of good faith and fair dealing arises. *Auto Channel*, 144 F.Supp.2d at 791.

■ Quadrille cannot maintain a claim based on breach of a fiduciary duty. A fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to

act primarily for another's benefit in matters connected with such undertaking." *Steelvest Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 485 (Ky.1991). An ordinary business relationship or an agreement reached through arm's length transactions "cannot be turned into a fiduciary one absent factors of mutual knowledge of confidentiality or the undue exercise of power or influence." *Anchor v. O'Toole,* 94 F.3d 1014, 1024 (6th Cir.1996). The relationship between Quadrille and Cattlemen's was not one where either party owed a fiduciary relationship to the other. Again, we need review only Schoettmer's testimony to reach our conclusion. When asked if there was any relationship between the parties other than the alleged agreement, Schoettmer responded "no," and he testified that his claim that there was a fiduciary duty arose solely from the alleged agreement. Such an allegation cannot sustain an action for breach of a fiduciary duty. *Id.*

■ We now turn to the issues raised by both parties concerning the jury's verdict on Quadrille's quantum meruit claim. Because we agree with Cattlemen's that the trial court erred when it denied its motion for a directed verdict, we do not address Quadrille's complaint regarding the jury instructions.

■ The standard of review of a denial of a motion for directed verdict is as follows:

Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved

to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice.

*Brooks v. Lexington–Fayette Urban County Housing Authority,* 132 S.W.3d 790, 797–98 (Ky.2004) (internal quotation marks and citations omitted).

We have reviewed the record and have drawn all reasonable inferences from the evidence in Quadrille's favor. Having done so, we can reach no conclusion other than that directed verdict should have been granted and reverse.

■ Recovery under the theory of quantum meruit can be had regardless of the absence of an enforceable contract. *Baker v. Shapero,* 203 S.W.3d 697 (Ky. 2006).

A contract implied by law allows for recovery *quantum meruit* for another's unjust enrichment. It is not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be a recovery as if promises were made. The courts supply the fiction of the promise to permit the recovery. Furthermore recovery *quantum meruit* may be had irrespective of the intentions of the parties, and sometimes even in violation of them.

*Perkins v. Daugherty,* 722 S.W.2d 907, 909 (Ky.App.1987) (citations omitted). However, merely because work was performed that benefited another does not necessarily warrant recovery.

The party proceeding under a quantum meruit theory must establish the following elements:

1. that valuable services were rendered, or materials furnished;

2. to the person from whom recovery is sought;

3. which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and

4. under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

66 Am.Jur.2d *Restitution and Implied Contracts* § 38 (2001).

Cattlemen's contends that because Quadrille did not perform the work on the proposal with the expectation of a cash payment but did so in pursuit of its own business interest, it cannot recover under a quantum meruit theory. Specifically, Cattlemen's points to Schoettmer's trial testimony which, it contends, entitled it to a directed verdict. Schoettmer testified as follows:

Question: You didn't keep any time records because you didn't think you'd be billing by the hour, correct?

Schoettmer: That's correct.

Question: And if you didn't think you were being billed by the hour, certainly the Kentucky Cattlemen's Association never thought they would be getting billed by the hour?

Schoettmer: I can't imagine that they would. But I can't speak for them.

Question: Well, in fact, you even told them—they even asked you if you would consider working by the hour to do this project? Is that correct?

Schoettmer: That's correct.

Question: You said no, you didn't want to be paid by the hour?

Schoettmer: That is correct.

Question: You wanted to get your proposals funded?

Schoettmer: That's correct.

Question: You wanted to get your company going. Correct?

Schoettmer: That is correct.

In *Corbin's Ex'rs v. Corbin*, 302 Ky. 208, 213, 194 S.W.2d 65, 68 (1946), the court held that where the services rendered benefited both parties, there can be no recovery under the quantum meruit doctrine because services performed for the mutual benefit of both parties are ordinarily done without the expectation of payment. Our Supreme Court has also recognized that while quantum meruit remains a theory for recovery, because of the structure and complexity of modern industrial society, it is not viable in all situations. *Bishop v. American States Life Insurance*, 635 S.W.2d 313 (Ky.1982). The theory is not applicable, for instance, to insurance and real estate sales where the work performed is done in anticipation of a future benefit and not a direct cash payment. *Id.* at 315.

We believe the holdings in *Corbin's Ex'rs* and *Bishop* are entirely consistent with the general rule as cited in 66 Am. Jur.2d *Restitution and Implied Contracts* § 47 (2001):

Where no compensation is agreed upon in advance for services requested by and performed for another, the presumption that compensation was intended is rebutted by circumstances which negative such an intention, and one of such circumstances is a strong self-interest in the outcome of the transaction by the person furnishing the services. Thus, the expectation of a future business advantage or opportunity cannot form the basis of a quantum meruit claim; a company cannot recover for the

alleged services it renders in submitting a program to a second company where it is conclusively established as a matter of law that the alleged services were preliminary services performed without any thought of direct cash compensation but with a view to obtaining business through a hoped-for contract.

The inference of a promise to pay for services is also negatived where the circumstances or conduct warrant a contrary inference or the person benefited has said or done nothing from which such a promise may be inferred, or where, at the time the services were rendered, it was intended, understood, or agreed that no payment should be made for them, or where the services were performed without authority, express or inferred. (footnotes omitted).

Both state and federal courts which have had the opportunity to address quantum meruit in the context of work performed in the pursuit of a business advantage have consistently agreed with the recited rule.

In a case of first impression in Texas, the court in *Peko Oil USA v. Evans,* 800 S.W.2d 572 (Tex.App.1990), thoroughly examined case law from those jurisdictions which had considered the question and provided an informative review of the courts' decisions. Ultimately, the Texas court adopted the general rule that there can be no recovery for services performed without thought of a direct cash payment nor for those performed to obtain a future business contract. *Id.* at 577.

[N]o recovery can be had for the alleged services as a matter of law. We reach these conclusions because it is elementary in the law governing quantum meruit recovery for work and labor that no recovery may be had for services performed, without thought of direct cash compensation, for business reasons. *Maple Island Farm,* 209 F.2d at 871–72.

Moreover, no recovery can be had for preliminary services that are performed with a view to obtaining business through a hoped for contract. *Maple Island Farm,* 209 F.2d at 871–72. *See also Dunn v. Phoenix Village, Inc.,* 213 F.Supp. 936, 952–54 (W.D.Ark.1963) (where plaintiff's chief purpose in obtaining loan commitments was to place himself in a favorable position to write insurance that might be required by the lenders); *Gould v. American Water Works Serv. Co.,* 52 N.J. 226, 245 A.2d 14, 16–17 (1968)(where plaintiff dug water wells in the hope that he could negotiate a favorable rate of the well or property to defendants who owned adjacent lands); *Anderson v. Distler,* 173 Misc. 261, 17 N.Y.S.2d 674, 678 (1940)(where plaintiff furnished information to defendant with intent of receiving other business).

*Id.* at 578.

Similar to the present case, in *Cherokee Oil Co. Ltd. v. Union Oil Co. of California,* 706 F.Supp. 826 (M.D.Fla.1989), the court reiterated the general rule that quantum meruit is available where the parties understand and intend that compensation is to be paid. *Id.* at 830. However, the plaintiff testified that when he provided expert and consultation services to the defendant he did not intend paid compensation but performed the services in hopes of obtaining an exclusive agency contract. The court held that the plaintiff's testimony, as a matter of law, precluded the recovery sought. *Id.*

As in *Cherokee Oil Company, Ltd.,* the intent and understanding of the parties was that the work was not performed with expectation of payment. Schoettmer's testimony was unequivocal that his work on the proposal was in hopes of obtaining the grant money to begin his business and that

he specifically rejected Cattlemen's offer of payment on an hourly basis. Under the circumstances, we conclude that the trial court erred when it denied Cattlemen's motion for a directed verdict.

The trial court's summary judgment on the issues of breach of contract, good faith and fair dealing, and breach of fiduciary duty is affirmed. The judgment awarding Quadrille damages on the claim of quantum meruit is reversed.

ALL CONCUR.