RENDERED:  APRIL 22, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1574-MR

EARLEY M. JOHNSON, II                                                   APPELLANT

v.
APPEAL FROM BOURBON CIRCUIT COURT
HONORABLE JEREMY M. MATTOX, JUDGE
ACTION NO. 15-CI-00065

KENTUCKY ENTERPRISES, LLC                                              APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  COMBS, GOODWINE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  Earley M. Johnson, II, the defendant below, has appealed

from summary and final judgments of the Bourbon Circuit Court related to his

counterclaim against Kentucky Enterprises, LLC.  Issues include the application of

the parol evidence rule and the statute of frauds to his breach of contract

counterclaim, whether Johnson was entitled to recover under a *quantum meruit*

theory, and whether the amount he recovered under his unjust enrichment claim was proper. We reverse and remand.

The underlying case began with the filing of a verified complaint by Kentucky Enterprises, LLC, (KE) with the Bourbon Circuit Court on March 13, 2015. Johnson was the sole named defendant. KE alleged that on January 31, 2012, Johnson executed and delivered to it a promissory note in the amount of $200,000.00. The promissory note stated:

> FOR VALUE RECEIVED, the undersigned (Maker) does hereby promise to pay to the order of Kentucky Enterprises, LLC, 1800 South Main Street, Paris, Kentucky, the sum of Two Hundred Thousand Dollars ($200,000.00), with interest thereon at the rate of two and one half percent (2.5%) per annum on DEMAND but no earlier than February 1, 2013. Upon demand for payment being made and communicated to Maker in writing, the Maker shall then have twelve months to fully pay the entire remaining unpaid principal balance and accrued interest thereon at the rate set forth above. In the event of default of these terms of payment, the default rate of interest for both prejudgment and postjudgment amounts shall be four (4%) percent per annum[.]
>
> All parties hereto, whether makers, endorsers, sureties, guarantors and otherwise hereby waive notice of dishonor, protest, notice of protest, and notice of non-payment of this obligation, and further waive all exemptions, whether Homestead or otherwise, to which they or any of them may now or hereafter be entitled under the laws of this state or any other state.
>
> All notices to the Maker shall be provided in writing to the address set forth below.

KE alleged that Johnson had subsequently defaulted on the note and owed the entire sum of the note along with interest. Therefore, KE demanded a judgment against Johnson for the amount of the note, plus interest, as well as court costs and attorney fees.

In response to the complaint, Johnson filed an answer and counterclaim seeking a declaration of rights and damages. In the answer, Johnson alleged several affirmative defenses, including that he was entitled to a set-off for sums KE owed to him and that KE's claims were barred by the doctrine of unjust enrichment. In his counterclaim, Johnson alleged that in January 2012, he and KE had entered into an oral agreement whereby he would provide or make available to KE certain goods and services for its use and benefit, in exchange for the payment of the goods and services. They agreed to address the value of the goods and services at a subsequent date, when they would be able to determine the fair market value. Johnson believed that the goods and services he provided were valued at an amount in excess of the amounts KE claimed in its complaint. He also alleged that he had fully performed under the oral agreement and had provided the goods and services as promised. KE had failed to pay Johnson for any of the goods and services provided and was, therefore, in default. Based upon these allegations, Johnson alleged a claim for breach of contract and sought a declaration of rights pursuant to Kentucky Revised Statutes (KRS) 418.040 that the value of the goods

and services he provided to KE exceeded the amounts claimed by KE. In addition, Johnson alleged claims under unjust enrichment and *quantum meruit* theories.

In its answer, KE denied the allegations Johnson raised in his counterclaim, and it specifically denied the existence of an oral agreement or that there was an agreement to address the value of the goods and services at a later date. It raised the affirmative defenses of waiver and estoppel, the statute of frauds, the statute of limitations, laches, and fraud.

In his answers to KE's interrogatories, Johnson identified the specific goods and services that he claimed were the subject of the alleged oral agreement between him and KE:

> Goods and services include, but are not limited to the following: 1) Extensive and complicated backside building of website and development of web workings for gitguns.com; 2) guidance, advice, mentoring and assistance in getting established with distributors of guns and related accessories; 3) web tie-in to Gunbroker; 4) business set up and consulting including electronic bound book for firearms sales, POS [point of sale], federal-related compliance and licensing matters; 5) wholesaling to Gitguns and gitguns.com; 6) Five Kimber 45 caliber pistols at $2500 each.

As to the valuation technique to be used, Johnson stated:

> The value of the goods and services were to be determined based upon the costs incurred, the value of time and effort invested by Defendant and his agents and employees and by the overall value of the product produced. Such valuation would take into account categories of items and work outlined in Answer to

Interrogatory No. 2, above. At the time of the initial discussions and entering into the agreement, it was anticipated that the value of the goods and services to be provided by Defendant would be at least $200,000 and in all likelihood more because of the needs of Plaintiff and his agents and employees.

On November 29, 2016, KE filed a motion for summary judgment on its complaint and on Johnson's counterclaim, stating that there were no genuine issues of material fact to be decided and that it was entitled to a judgment as a matter of law. As to its own complaint, KE stated that there had not been any evidence presented that that promissory note was unenforceable, and Johnson admitted in his response to KE's requests for admissions that he had executed the promissory note attached to the complaint and that a demand for payment had been made. Further, Johnson admitted that he was not challenging the enforceability of the promissory note in his response to a motion to compel. As to the counterclaim, KE argued that Johnson failed to produce any documentary evidence to support his allegations that an oral agreement existed; that the parol evidence rule would not permit the introduction of any proffered evidence or testimony to vary the terms of an unambiguous contract (the promissory note); that the statute of frauds had been violated; and that Johnson failed to establish the essential elements of his case.

In response, Johnson stated that summary judgment was not appropriate as material issues of fact remained to be decided. While he had not contested the authenticity of the note, Johnson argued that he had asserted a

counterclaim and the right to set off the amount due under the promissory note. The extent and the value of the goods and services that Johnson, along with his agents and employees, provided to KE was an issue of fact to be decided. He also disputed KE's arguments related to the parol evidence rule and the statute of frauds.

The parties presented oral arguments to the court on their respective positions, after which the court entered an order on October 12, 2018, granting in part and denying in part the pending motion for summary judgment.[1] First, it held that, because the promissory note was not ambiguous but was an integrated agreement, parol evidence of a contemporaneous agreement was inconsistent and inadmissible. Second, it held that the alleged oral agreement violated the statute of frauds, noting that neither party had addressed whether the oral agreement could have been completed in less than one year. In addition, modifying the promissory note to the extent that repayment would be set off by the provision of goods and services would materially affect the terms of the written agreement and must be reduced to writing to be enforceable and comply with the statute of frauds. Therefore, the court granted summary judgment on KE's verified complaint.

---

[1] The court also denied KE's motion to dismiss Johnson's counterclaim, which addressed whether Johnson was the real party in interest.

As to Johnson's counterclaim, the court granted summary judgment on the breach of contract counterclaim as there was no contract, and on the declaration of rights claim as Johnson failed to present any affirmative evidence showing the value of the goods and services. It, however, denied summary judgment on the unjust enrichment and *quantum meruit* claims.

Rather than holding a trial, the parties agreed they would present their witnesses via deposition and would orally argue their respective sides and follow up with written arguments once additional depositions were completed. The record contains the depositions of Cliff Shumate, the president of KE; Johnson, who had been the owner of Security Safe Outlet (SSO), a gun store in Paris, Kentucky; Jedidiah Reader, who worked for KE in tech support, networking, and web development; Jennifer Arnett, who had been the vice president of SSO; and Matthew Denninghoff, who worked as a web developer for SSO.

Cliff Shumate testified by deposition on October 11, 2016. He and his wife, Kim, are the sole members of KE, a limited liability company located in Paris, Kentucky, that was formed to be a packaging and fulfillment center. KE obtained a federal firearms license (FFL) in 2012 and began to distribute firearms and sporting goods equipment related to hunting and fishing. KE sold merchandise through internet orders as well as in a retail store, GitGuns, later called GitOutfitted.

Shumate met Johnson when he was a partner with Bud Wells at Bud's Gun Shop, located in Paris (this became SSO). Shumate stopped in the store in January 2012 to tell Johnson he planned to start his own firearms distribution business, both retail and online, and that they would be competitors. He described this as a "gentlemen's discussion" as it was a small town. Shumate said Johnson responded, "Why don't you buy mine?" Shumate knew about litigation pending between Bud and Johnson, as well as the other partners, and, therefore, declined Johnson's offer to purchase the business. Shumate described his understanding as "I think it was the gentlemen's agreement that we would try to help each other out until the lawsuit was settled, and then open the discussion again. That was my understanding." The promissory note with Johnson was dated January 31, 2012. His discussion with Johnson about money began following their first meeting in early January when they discussed that Shumate would be opening his own business. Johnson needed short-term capital and asked to borrow money from him.

Shumate detailed the gentlemen's agreement between him and Johnson as including: 1) Shumate's providing office labor and shipping materials for free; 2) Johnson's providing guidance, advice, mentoring, and assistance in getting KE established with gun distributors/related accessories; and 3) Johnson's offering to have Mr. Denninghoff assist KE's IT person, Mr. Reader, in building

the website to sell firearms and accessories. Shumate testified that, "based on the . . . interactions, we were cooperating. I was helping him where I could pitch in and help. He offered to pitch in and help wherever he could. There was no contractual, no mutual agreements, and there were no cost sheets or price quotes." Shumate denied that there was an agreement to settle up at some point, and no demand for payment was ever made. His belief was that the help each was offering was provided for free. He went on to state that the deal with Johnson unraveled quickly when distributors revoked Johnson's credit. He also denied that Johnson had helped with the electronic bound book for firearm sales, the POS system, related federal compliance, or licensing matters.

As to the promissory note, Shumate stated that Johnson presented it to him in his (Johnson's) office. KE's finance director, Chris Sherman, notarized Johnson's signature. Shumate made his first demand on the promissory note in a letter dated May 9, 2013, which was hand-delivered to Johnson on May 9th at Johnson's office. Shumate understood the promissory note to be outside of the various services that were provided. There was never any discussion that these were connected.

Earley Johnson testified by deposition on December 8, 2016. He was retired and living in Carson City, Nevada. In 2012, he was involved with SSO, a retail establishment in Paris, Kentucky. Johnson was the sole owner of SSO,

which was dissolved on December 28, 2013. Johnson admitted that he signed a promissory note in January 2012, and he did not contest the legitimacy or enforceability of the note. His version of the circumstances surrounding the execution of the note is as follows:

> Well, the note came by Clifton to me in early '12, maybe the end of 2011, and he told me that he was thinking about getting into the gun business, and that he would be a person that would be, you know, a competitor, and he just wanted to let me know. And I said thank you. I said, If there's anything I can do to help you out, let me know. And I said, I'm in a little financial jam here. And I offered to sell him my store, and he said, well, he wasn't interested in doing that right now. I said, Well, Security Safe Outlet needs some operating capital, and we have – my two associates, people that work for me, Jennifer Arnett and Matthew Denninghoff, we've been trying to figure out some way, besides selling the guns and having the retail, and the Internet business was to expand our activities.

> So we had come up with a model to help level the playing field between small gun dealers and big gun dealers that have a large Internet presence. And the model would be one in which the problems with the small gun store was inventory, storing a lot of inventory on their premises, the cost of that inventory, and freight for the inventory to come in, the dollars it took to carry that inventory, and then their customer base, because most of their customer base was just walk-in traffic.

> And so for the bigger gun dealers that had retail outlets and very large Internet presence, they were able to acquire the – what they could do was that – the manufacturers would sell guns to the distributor and the distributors then would distribute it to the dealers, to the small dealers. And for the big guys, what they could do,

-10-

that had the technology and the Internet IT guys to write the programs, what they could do was take the inventory of a distributor, however many thousands of guns they had, and then they could then put it on – write a program that then would take their inventory, once the distributor allowed them to do it. And they would take that inventory, and then they could put it on their computers in their store so that if a customer came in and said I want a gun, and he sees a gun laying in the cabinet, but I like that. But I really would like something else. What do you have? And the guy could go and show them their computer and say, oh, well, here's a gun with a little different flavor, whatever. Are you interested in it? Yes. I want that one.

So then the customer – he would say it would take me a couple of days to get it. So then the customer would buy the gun, if they were interested, buy the gun. The dealer would have it shipped to him from his distributor, and then he would already have sold it to the customer.

Johnson told Shumate he could offer his expertise to him in setting up his own store, and Shumate agreed.

[S]o I said, If you're interested, we can help you get set up, started. I have an operation that would compete with the big gun dealers. And he said, Let me think about that. So then he left, and we met back maybe a week later, whatever, and he said he would like to pursue that adventure. I said, That's fine with me. I'll get Jennifer and Nancy and use our IT guy working on that part of it. And I said that I could use some operating capital and he said how much? I said, Well, I don't know how much this project is going to cost because we're just putting it together. And I said, But I personally need some operating costs of 200,000. And he said, okay, I'll loan you the money for that. I said, Well, then I'll help you set up your Internet business and help you with your

store as much as – whatever you need, and contacts with the different distributors and buying groups, if he was interested in getting into some buying groups in order to get the product at the right price. And there was advantages to all of that.

Johnson said that he asked his law firm to draft the promissory note. He did not obtain any other documents from the law firm related to his dealings with KE. SSO employee Matthew Denninghoff wrote the code for the computer system; he had previously designed and written the code for a large internet gun business. Johnson discussed the goods and services provided to KE pursuant to the alleged verbal agreement between him and Shumate. He sold firearms to Shumate at his costs, plus a dollar or two, as well as accessories, and he provided help with distributors. Johnson stated that the value of Mr. Denninghoff's involvement with Shumate was $200,000.00, which was based on the knowledge and expertise he brought to the program. He did not recall the cost to himself or SSO to build the website. Johnson stated that Shumate sent two employees to help him at the store with fulfilling orders; he considered this to be training for when Shumate opened his own retail store.

Shumate made a demand on the note in writing, but Johnson had never made a payment on it. He told Shumate and his wife at a meeting at Billy's Barbeque that he did not have the money to repay the note as the bank had foreclosed on the store, and he was trying to sell it. The mortgage note was

between $350,000.00 and $375,000.00. He told Shumate that he could not pay the note and that the only thing he could offer was his real estate: "[T]he best they can do is give you this building for the mortgage, and then you could turn around and sell it and make money because of the prime location of the building[.]" Johnson valued the real estate he offered to sell at $700,000.00. He was still intending to pay the note, and Shumate understood that. Johnson never told Shumate that he did not owe the money; he did not think the timing was right to present to him that the goods and services he provided were worth $200,000.00.

On examination from his attorney, Johnson testified that he believed that at the time he signed the promissory note, he and Shumate had a meeting of the minds on the deal that Johnson and his employees would build the website for Shumate and would advise and assist Shumate's employees to get his gun business started. He believed that the providing of goods and services, advice, consultation, and assistance would be in exchange for some future payment. Johnson advised Shumate on the basics of the gun business, including pricing, compliance, ATF issues, licensing, the point of sale system, the bound book, and federal rules and regulations. He did not know what the payment would be at the time because he did not know the extent of goods and services that would be needed. He believed Shumate understood this and that they would reconcile what he owed to Johnson at some point. He believed the value of goods and services provided was in excess of

$200,000.00. He believed the promissory note and the oral agreement about what he would be providing were parts of the same transaction.

Jedidiah Reader testified by deposition taken March 30, 2017. He received a four-year degree in computer science from Morehead State University in December 2008, and he began working for KE in September 2011 as a programmer. He was also the IT liaison between KE and Bud's Gun Shop. He eventually worked with Matthew Denninghoff to set up KE's website server, which he said for the most part was installing programs and setting up accounts. Mr. Reader had never done this before. They spent two weeks to set up the website, and Mr. Reader spent another two weeks to set up any web front Shumate wanted. The website went live in late March or early April 2012.

Matthew Denninghoff testified by deposition on October 23, 2019. He works in the computer programming and web development field. He began working in web development and customizing at Bud's Gun Shop in 2003. Mr. Denninghoff began working for Johnson and SSO in 2010 when Johnson and Bud split, and he continued to work there until 2013. He began working on GitGuns, KE's website, in early 2012. He remembered doing at least two months of work for KE while he was employed and paid by Johnson. His website planning notes begin on February 9, 2012, and end on July 12, 2012. He was told, "we're working with Cliff [Shumate]. I want you to do what you've done for us and make

-14-

it work for him.  He's going to sell guns, too."  Mr. Denninghoff testified about the cost involved in web development based upon his experience in designing, programming, and maintaining KE's website as well as his exposure to these types of products in the area of business software development.  He said his current employer contracts its programmers out at $150.00 to $300.00 per hour to do work similar to what he did to build KE's website.  The cost to hire a professional company to build and maintain a similar website, licensing a year's worth of software code, and training on the use of the system could exceed $200,000.00.  Mr. Denninghoff spent one to two months training Mr. Reader on the system.  He said Mr. Reader did not contribute to the building, designing, or completion of the website.

Jennifer Arnett testified by deposition, also taken October 23, 2019.  She began working for SSO in 2000, and she worked there for 14 years until the business closed.  As to the relationship between Johnson and Shumate, Ms. Arnett stated that Shumate approached SSO about setting up his own FFL and website to sell firearms online, and they walked him through the process to get started.  Based on her experience in the business, she had the connections and infrastructure to create a turnkey operation for Shumate and mentor him.  There was no formal agreement between the two sides.  She described the relationship between her and the Shumates as a friendship, and she wanted to help.  Johnson/SSO was going to

-15-

provide Shumate with Mr. Denninghoff to give him the back end of their website so that KE would be able to tie into SSO's inventory, which would permit KE to sell firearms at a better cost. Shumate also sent his employees to SSO's store to help out. She was not in any meetings where Johnson and Shumate discussed the underlying agreement that would permit her to provide any specific information about it. She said there were no discussions about the value Johnson would be bringing to the equation as far as the buying group price point and the website. She said this was the first time they had tried to set up something like this. Her view of the value of what Shumate received from having a turnkey business handed to him to sell firearms online was a $1 million benefit from creating the relationship with the distributors. Any buying benefit that Johnson could have conferred ended when the business was shut down in 2014. She was aware of the promissory note after it had been executed.

In his pretrial brief, Johnson assessed the value of goods and services provided to KE totaled between $1,414,000.00 and $1,724,000.00, and included:

- $1,000,000.00 in buying power, advice, relationship, consulting, and turnkey operation.

- $300,000.00 - $600,000.00 to build the website.

- $64,000.00 to customize the website.

- $50,000.00 - $60,000.00 for tutoring.

Johnson requested that the court find the value of the goods and services he provided to KE totaled $1,660,000.00 and enter a final judgment against KE in that amount. The judgment, he stated, would serve to offset the prior ruling on KE's promissory note. In its brief, KE argued that there was no factual support for Johnson's unjust enrichment claim.

On December 5, 2019, the court held a short bench trial and heard testimony from Shumate as well as arguments from the parties. Shumate discussed the testimony from the two depositions that had recently been taken, including Jennifer Arnett's reference to a "million dollars' worth of value." He denied ever discussing or being promised such an opportunity, and it never materialized. Shumate said KE began helping Johnson's company around the time the promissory note was signed at the end of January 2012, and they stopped assisting each other in July 2012. Shumate discussed the fact that there was a lawsuit Johnson's company was involved in with an ex-partner. He did not know the details of the lawsuit, but he did know that Johnson needed short term capital to "stay alive" until the lawsuit ended, which was part of the promissory note. Johnson's business was struggling, and Shumate sent his employees to help out once the creditors had closed Johnson's line of credit. Shumate provided shipping cartons, and KE's employees answered the telephone and greeted customers. Shumate never asked for compensation for their agreement had been to assist each

other at arm's length as best as possible. He understood that Johnson would provide assistance to them and they would assist Johnson. There was no mutual agreement, and there was never an invoice for any of the services between them.

Regarding the website, Shumate stated that it had not been perfected when his IT person, Mr. Reader, came in. It was a work in progress, and there were many flaws to correct. Mr. Reader rewrote the whole program due to these flaws. Shumate closed his operation in mid-2013. By the end of 2012, the losses were so significant, he and the owners decided to wind the company down. It took awhile to do this because they had inventory. Tax forms showed a $366,185.00 loss for 2012.

Shumate testified that the agreement to assist each other had nothing to do with the promissory note. There were no further written mutual agreements between him and Johnson. Shumate understood that it was a gentlemen's agreement to help each other until Johnson could get through the lawsuit, when they would then discuss further business ventures together. There were no written agreements, and Johnson was rarely at the building to discuss anything. Shumate took action to collect on the note when the term matured. Johnson had already closed his business or it was in disarray. Shumate presented the demand to Johnson in person in his office and followed up with other demand letters. Johnson would make promises of payment, including installments, and said he had

a deal in the works if Shumate could be patient. Johnson never followed up on his promises to pay. There was never any discussion about offsets based on the work and services Johnson provided until the counterclaim was filed. There were no discussions of cost for the services.

On January 14, 2021, the circuit court entered its findings of fact, conclusions of law, and final judgment related to Johnson's surviving counterclaims for unjust enrichment and *quantum meruit* as well as to determine the value of goods and services Johnson provided to KE. For the unjust enrichment claim, the court determined that the only amount Johnson could recover was his expense for the benefit conferred on KE, which was $3,666.67, the monthly pay for Mr. Denninghoff's services in creating the website. For the *quantum meruit* claim, the court held that Johnson failed to satisfy the fourth element of the theory; namely, that he did not reasonably notify KE that he expected to be paid. Accordingly, Johnson could not recover under a *quantum meruit* theory. The court entered a judgment dismissing the unjust enrichment claim as to the goods and services provided, other than for the website, and ordered that Johnson was entitled to recover $3,666.67. That amount would be applied to

the amount Johnson owed to KE under the promissory note. It also dismissed Johnson's *quantum meruit* claim. This appeal now follows.[2]

On appeal, Johnson argues that the circuit court erred in granting summary judgment on his counterclaims for breach of contract and *quantum meruit*, in holding that the benefits conferred on KE were not at Johnson's expense, and in finding that the value of the goods and services conferred on KE did not exceed $3,667.67.

We shall first consider whether the circuit court properly granted summary judgment on Johnson's counterclaim for breach of contract. Our standard of review is set forth in *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016), *as modified on denial of reh'g* (Aug. 24, 2017):

> Summary judgment is a remedy to be used sparingly, *i.e.* "when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (citations omitted). We frequently caution, however, the term "impossible" is to be used in a practical sense, not in an absolute sense. *See id.* (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992)). The trial court's primary directive in this context is to determine whether a genuine issue of material fact exists; if so, summary judgment is improper, *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.

---

[2] Johnson originally filed a premature notice of appeal on December 3, 2020, prior to the date the circuit court entered its final judgment. He filed an amended notice of appeal once the court entered its final judgment on January 14, 2021.

1991). This requires that the facts be viewed through a lens most favorable to the party opposing summary judgment, here the Estate. *Id*. It is important to point out that "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id*. at 482.

A motion for summary judgment presents only questions of law and "a determination of whether a disputed material issue of fact exists." *Shelton*, 413 S.W.3d at 905. Our review is de novo, and we afford no deference to the trial court's decision.

Johnson contends that multiple factual issues exist regarding whether the parties entered into an oral contract whereby Johnson would provide goods and services to KE in exchange for compensation in the amount of the goods and services provided, which would preclude summary judgment. The court, he stated, did not address whether any disputed issues of material fact remained but rather held that his counterclaim was barred as a matter of law by application of the parol evidence rule and the statute of frauds.

We shall first address Johnson's argument that the parol evidence rule does not apply. In *New Life Cleaners v. Tuttle*, 292 S.W.3d 318 (Ky. App. 2009), this Court explained the doctrine as follows:

> *Parol evidence* has been defined as oral evidence rather than written evidence. *Black's Law Dictionary* 1006 (8th ed. 2004). Under the parol evidence rule, when parties reduce their agreement to a clear, unambiguous, and duly executed writing, all prior negotiations, understandings, and agreements merge into the instrument, and a contract

as written cannot be modified or changed by prior parol evidence, except in certain circumstances such as fraud or mistake. *Childers and Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970). Only a mistake of fact will affect the enforceability of a contract, not a mistake of law. *Raisor v. Burkett*, 214 S.W.3d 895, 906 (Ky. App. 2006) (citations omitted). It is presumed that the written agreement is final and complete and that all prior negotiations between the parties have either been abandoned or incorporated into the final written instrument. *See Childers v. Lucas*, 301 Ky. 763, 192 S.W.2d 714 (1946). Kentucky courts have long recognized that oral agreements made prior to a written contract merge into the written contract. *Prudential Life Ins. Co. of America v. Bowling*, 237 Ky. 290, 35 S.W.2d 322, 323 (1931).

It is also well settled that, "[i]n the absence of ambiguity a written instrument will be strictly enforced according to its terms." *Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky. 1965); *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966). Further, "[a] contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent, yet reasonable, interpretations." [*Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002)]; *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105-106 (Ky. 2003). "[W]e are not permitted to create an ambiguity where none exists even if doing so would result in a more palatable outcome." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 836 (Ky. App. 2000) [(]citing *Friction Materials Company, Inc. v. Stinson*, 833 S.W.2d 388, 391 (Ky. App. 1992)[)].

Words are to be accorded their "ordinarily used meaning unless the context requires otherwise." *Bays v. Mahan*, 362 S.W.2d 732, 733 (Ky. 1962). "As a cardinal principle relating to the construction of a contract, it has long been recognized and held in this and other

jurisdictions that where the instrument is so clear and free of ambiguity as to be self-interpretive, it needs no construction and will be performed or enforced in accordance with its express terms." *Ex parte Walker's Ex'r*, 253 Ky. 111, 68 S.W.2d 745, 747 (1933) (citations omitted). The only purpose of judicial construction is to remove ambiguity and doubt and to make certain that which in itself is uncertain. *Frear*, 103 S.W.3d at 106. While nothing can be added to or taken from a written contract by prior parol evidence, it is the rule that ambiguities may be explained by parol evidence. *Stubblefield v. Farmer*, 291 Ky. 795, 165 S.W.2d 556, 557 (1942).

Long ago, Kentucky courts adopted the legal analysis of I. Greenleaf on Evidence, Section 275:

> When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing, and all oral testimony of a previous colloquium between the parties or of conversation or declarations at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected.

*Russell v. Halteman's Adm'x*, 287 Ky. 404, 153 S.W.2d 899, 904 (1941) (citing *J.I. Case Threshing Machine Company v. Mattingly*, 142 Ky. 581, 134 S.W. 1131, 1133 (1911)). In short, the import of the parol evidence rule is "conclusively presumed" to extend to every written contract, regardless of the presence of a merger or

parol evidence clause, because it is a matter of substantive law.

*New Life Cleaners*, 292 S.W.3d at 322-23.

Johnson cites to *Texas Gas Transmission Corporation v. Kinslow*, 461 S.W.2d 69, 71 (Ky. 1970), to argue that the oral agreement was a collateral contract and thus not subject to the parol evidence rule:

> The basic rule applicable is thus stated in 30 Am.Jur.2d, Evidence, Section 1049, page 184:
>
>> 'An exception to the parol evidence rule, which is similar in many respects to that of the doctrine of partial integration, is known as the 'doctrine of collateral contract.' Under this doctrine, a prior or contemporaneous oral contract which is independent of, collateral to, and not inconsistent with, the written contract, may be proved by parol evidence. A collateral oral agreement is allowed to be proved because it is a thing apart from the one represented by the writing.'

Johnson acknowledges that the promissory note was enforceable. The collateral oral agreement, he argued, addressed a separate agreement that he would provide assistance to KE in setting up its gun business and would be paid for this, which would entitle him to a set-off.

We agree with Johnson that the promissory note memorialized Johnson's obligation to repay the $200,000.00 loan. The alleged oral agreement, Johnson argues, did nothing to vary or contradict the written promissory note.

Rather, it provided Johnson with a right to a set-off of that loan amount due to KE's breach and the mutuality of their respective debts. *See Traylor v. Lafayette Nat. Bank*, 158 Ind. App. 552, 558-59, 303 N.E.2d 672, 676 (1973) (citation omitted) ("The above-mentioned general [parol evidence] rule is not, however, violated by allowing testimony of a distinct collateral or contemporaneous oral agreement which is not in conflict with the terms of the written instrument. A collateral independent parol agreement between the parties which has been acted upon prior to the time of the writing may be proven, even as against the written obligation. To admit evidence of a preliminary or contemporaneous oral agreement in an action on a contract or other written instrument, it must be consistent with the instrument and must not tend to vary or contradict its terms, and the terms of the oral agreement must be independent of those expressed in the writing, even though it may relate to the same subject matter."). We hold that the circuit court erred in concluding that the parol evidence rule applied in this instance to bar any evidence of an alleged, contemporaneous oral agreement.

Next, we shall address whether the alleged oral agreement violates the statute of frauds. KRS 371.010 provides, in relevant part, that:

No action shall be brought to charge any person:

. . . .

(7) Upon any agreement that is not to be performed within one year from the making thereof;

. . . .

unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent. It shall not be necessary to express the consideration in the writing, but it may be proved when necessary or disproved by parol or other evidence.

The circuit court observed that neither party addressed whether the oral agreement could have been completed in less than one year. However, it also observed that Johnson testified that the services he provided to KE in 2012 were still being presently used, apparently despite Johnson's argument below that he had fully performed his part of the oral agreement by providing goods and services. It further held that modifying the promissory note to provide that its repayment could be set off by the provision of goods and services by Johnson would materially affect the terms of the note and would therefore need to be reduced to writing to be enforceable and to comply with the statute of frauds.

Johnson argues that the circuit court erred in three respects. First, it improperly concluded that the alleged oral agreement was not to have been performed in less than one year, and thus subject to the statute of frauds, because KE continued to have the benefit of services Johnson provided to it in 2012. This,

he asserts, was not the relevant inquiry. Instead, "[i]n construing the Statute of Frauds, the general rule is that, if a contract may be performed within a year from the making of it, the inhibition of the Statute does not apply, although its performance may have extended over a greater period of time." *Williamson v. Stafford*, 301 Ky. 59, 62, 190 S.W.2d 859, 860 (1945). We agree with Johnson that there is no indication the agreement to provide goods and services would extend beyond a year.

Second, Johnson contends that the circuit court misconstrued the nature of the set-off when it stated that it would materially affect the terms of the promissory note. Again, we agree with Johnson that the oral agreement did not modify the promissory note in that there was no allegation that the parties had agreed that the note would be forgiven or become unenforceable if the goods and services were provided to KE.

Third, Johnson argues that the circuit court failed to apply the rule that once an oral agreement has been fully performed, the statute of frauds no longer applies. He cites to *Pilcher v. Stadler*, 276 Ky. 450, 457, 124 S.W.2d 475, 479 (1939), for the statement of the law that "a contract is no longer executory, and [the statute of frauds] has no application thereto, where it has been fully performed upon one side and the other party by its terms has a longer time than one year in which to perform his part thereof." Johnson presented evidence that he had

fulfilled his obligation under the oral agreement to provide goods and services to KE; KE was still obligated to pay him for the value of those goods. We agree with Johnson that the circuit court misapplied this rule as Johnson had established that he had completed his obligation under the alleged oral agreement. The circuit court's statement that full performance was the repayment of the loan and interest is incorrect. Therefore, the statute of frauds did not render the alleged oral agreement unenforceable.

The circuit court did not reach the question of whether an oral agreement existed between the parties. But we agree with Johnson that there are disputed issues of material fact as to whether there was an oral agreement between KE/Shumate and Johnson and, if so, whether it was breached. Therefore, we hold that the circuit court erred as a matter of law in granting summary judgment to KE regarding Johnson's counterclaim for breach of the oral agreement.

Next, in the event that Johnson fails to establish the existence and breach of an oral contract on remand, we shall address whether the circuit court erred in granting summary judgment to KE on Johnson's counterclaim seeking recovery in *quantum meruit*.

> Recovery under the theory of quantum meruit can be had regardless of the absence of an enforceable contract. *Baker v. Shapero*, 203 S.W.3d 697 (Ky. 2006).

> A contract implied by law allows for recovery *quantum meruit* for another's

unjust enrichment. It is not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be a recovery as if promises were made. The courts supply the fiction of the promise to permit the recovery. Furthermore recovery *quantum meruit* may be had irrespective of the intentions of the parties, and sometimes even in violation of them.

*Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987) (citations omitted). However, merely because work was performed that benefited another does not necessarily warrant recovery.

The party proceeding under a quantum meruit theory must establish the following elements:

1. that valuable services were rendered, or materials furnished;

2. to the person from whom recovery is sought;

3. which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and

4. under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

66 Am.Jur.2d *Restitution and Implied Contracts* § 38 (2001).[3]

---

[3] The elements of a *quantum meruit* claim are now found in the current (2022) version of this publication at § 34.

-29-

*Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc.*, 242 S.W.3d 359, 365-66 (Ky. App. 2007).

The circuit court held that Johnson had satisfied the first three elements of *quantum meruit* but failed to satisfy the fourth one, holding that Johnson "did not reasonably notify Mr. Shumate that he expected to be paid." Johnson argues that he was not required to give any type of notice as to payment, and we agree. In *Quadrille*, this Court observed:

> Where no compensation is agreed upon in advance for services requested by and performed for another, the presumption that compensation was intended is rebutted by circumstances which negative such an intention, and one of such circumstances is a strong self-interest in the outcome of the transaction by the person furnishing the services. Thus, the expectation of a future business advantage or opportunity cannot form the basis of a quantum meruit claim; a company cannot recover for the alleged services it renders in submitting a program to a second company where it is conclusively established as a matter of law that the alleged services were preliminary services performed without any thought of direct cash compensation but with a view to obtaining business through a hoped-for contract.
>
> The inference of a promise to pay for services is also negatived where the circumstances or conduct warrant a contrary inference or the person benefited has said or done nothing from which such a promise may be inferred, or where, at the time the services were rendered, it was intended, understood, or agreed that no payment should be made for them, or where the services were performed without authority, express or inferred. (footnotes omitted).

*Quadrille*, 242 S.W.3d at 366-67 (citing 66 AM.JUR.2d *Restitution and Implied Contracts* § 47 (2001)).[4] In the present case, there is no indication that Johnson provided the goods and services to obtain his own business advantage as they were to be in direct competition and, thus, the presumption that compensation was expected could not be rebutted under the circumstances. As Johnson states in his brief, "there are no circumstances . . . to suggest that it was reasonable for Shumate to assume that a competitor would provide him with a valuable and customized website, guidance and advice on entering the gun business, and valuable relationships with distributors for free." Accordingly, the circuit court erred in concluding that Johnson failed to satisfy the fourth element of his *quantum meruit* claim.

We shall also address Johnson's unjust enrichment argument, in which he asserts that the circuit court erred in holding that the majority of the benefits conferred on KE were not at Johnson's expense and in limiting the value of the goods and services to $3,666.67, which covered Mr. Denninghoff's salary for the time he was working on the website.

> To recover on a claim of unjust enrichment a plaintiff is required to "prove the following three elements: '(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value.'"

---

[4] The current (2022) version of this topic is now found in § 41.

*Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777-78 (Ky. 2017), *as corrected* (Mar. 22, 2018) (citations omitted).

Because the circuit court found that he was entitled to recover the salary paid to Mr. Denninghoff, Johnson argues that, logically, he was entitled to recover the value for all of the goods and services conferred upon KE. In support of this assertion, Johnson cites to *Northern Shipping Funds I, L.L.C. v. Icon Capital Corporation*, 998 F. Supp. 2d 301, 330 (S.D.N.Y. 2014), for the following statement: "Unjust enrichment claims are not limited to tangible monetary enrichment, but also include the receipt of an intangible benefit at the expense of another." Much of the services conferred upon KE were comprised of expertise and relationship building, which was provided through the time and energy of Johnson and his employees. This meets the definition of an intangible benefit provided at Johnson's expense, and the circuit court erred in not so holding.

Based upon this holding, we need not address Johnson's argument that the circuit court erred in limiting the value of the goods and services conferred on KE by Johnson to $3,666.67. If the court reaches this issue on remand, the proper analysis would require the court to consider the overall value of the goods and services provided, as appropriate.

For the foregoing reasons, the orders of the Bourbon Circuit Court are reversed, and this matter is remanded for further proceedings in accordance with this Opinion.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Carroll M. Redford, III
Elizabeth C. Woodford
Lexington, Kentucky

BRIEF FOR APPELLEE:

James Paul Brannon
Paris, Kentucky